Kenneth Herbert **HANNA** and Nathan
Modell, Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 24343.

United States Court of Appeals
Fifth Circuit.

March 5, 1968.

On Rehearing April 17, 1968.

Hughes, District Judge, dissented.

James J. Hogan, Miami Beach, Fla.,
for appellants.

Wallace H. Johnson, Asst. U. S. Atty.,
Miami, Fla., William George Earle, Atty.,
Dept. of Justice, Washington, D. C., Fred
M. Vinson, Jr., Asst. Atty. Gen., for ap-
pellee.

Before RIVES and GODBOLD, Circuit Judges, and HUGHES, District Judge.

RIVES, Circuit Judge:

This appeal is from judgments of conviction on counts one, four and five of a five-count indictment. Count one was directed against the defendant Hanna, and charged him with violating 18 U.S.C. § 1343 (wire fraud). Counts four and five were directed against both defendants, Hanna and Modell, and charged them with violating 18 U.S.C. § 1084 (wagering by wire) and § 1952 (using the telephone in interstate commerce to promote an unlawful activity). The defendants were convicted as charged in the three counts, and each was sentenced to six months' imprisonment followed by five years' probation. Hanna was also fined ten thousand dollars. The sentences were to run concurrently.

There was no dispute about the facts, and we adopt (with the exception noted in footnotes 1, 2 & 3, infra) the statement contained in the Government's brief:

"In the twenty-seven day period from November 24, 1965, to December 21, 1965 over 500 telephone calls were placed from defendant Hanna's phone to a distant information operator (e. g. 1–area code–555–1212) (R. 35). This was discovered during an investigation of Hanna's phone conducted solely by the American Telegraph and Telephone (sic) Company and its subsidiary, Southern Bell Telegraph and Telephone (sic) Company. Hanna's phone had become the focus of an investigation by the telephone company after an official of the company in New York detected an unusual condition on Miami phone number 945–9723. He notified Gerard Doyle, Security Manager of Southern Bell Telegraph and Telephone (sic) Company, of this unusual condition and that the condition indicated that in all likelihood a device known as a 'blue box' [1] was being

"1. A 'blue box' is technically known as a multi-frequency signal generator. It enables a caller to by-pass the toll

equipment of the telephone company and complete long distance calls without any record of the call being made. Thus, the caller avoids being billed for all calls placed while using a 'blue box'. (R. 35, 295).

"To operate a 'blue box' a person dials any number through his regular telephone which would provide access to the toll network (e. g. 1-area code-555-1212). Once this connection is established he is able to disconnect the number he has called by inducing on the line a 2600 cycle tone from his 'blue box'. Then by pushing buttons on his 'blue box' he is able to send sounds into the toll network corresponding to the sounds assigned to the digits in the called number and reach any number he desires without any reflection on his bill other than the original free call (R. 35, 36, 69).

used on the line. (R. 34, 295). Doyle investigates toll frauds for the telephone company. Doyle knew from experience that bookmakers use these devices. (R. 40–42, 295). So when he discovered that 945–9723 was subscribed to by Kenneth Hanna, whom Doyle knew to be a local bookmaker (R. 40, 295), he instructed company engineer, Ray Fowler, to determine if the unusual condition was a 'blue box'. On November 24, 1965 Fowler attached a piece of electronic equipment to Hanna's line capable of sensing a 2600 cycle tone originating at the subscriber's telephone. (R. 42).[2] It was attached

"2. Normally the 2600 cycle tone originates from a toll office within the long distance network and is not found on a subscriber's line. (R. 42). If a 2600 cycle tone does appear on the subscriber's line fairly often, it is a highly unusual situation suggesting that a 'blue box' is being used. (R. 44, 81). This is because a 'blue box' emits a 2600 cycle tone and although a 2600 cycle tone is within the upper reaches of the audible range (e. g. a high pitched scream) the frequent appearance of such a tone on the subscriber's line is very unlikely. (R. 64, 83).

to Hanna's line before the line reached the toll network. (R. 66). Each time the detection unit sensed a 2600 cycle tone it activated a 'peg counter meter' which is simply a counting device for totalling the number of times a 2600

cycle tone is perceived by the detection unit. (R. 42, 80, 41).

"That night Fowler called Doyle and indicated that the counter was registering. (R. 43). Doyle then advised him to put a tape recorder on Hanna's line to record the sounds made by the 'blue box'. (R. 43, 80, 82). The tape recorder was unattended and was set to cut off automatically 35-45 seconds after being activated by the 2600 cycle tone on the subscriber's line. (R. 43, 44).[3] Fowler was certain that a 'blue

"3. The placing of a recorder on the line was necessary to determine whether the telephone company was being defrauded. This is because although the appearance of a 2600 cycle tone on subscriber's line is unusual it is nonetheless possible that a high pitched scream could approximate 2600 cycles. (R. 64). Only by having a tape recorder on the line could the company determine the source of any 2600 cycle tone appearing on Hanna's line. (R. 81-83). Because the company's only interest was in toll fraud it was concerned with establishing two items: first, that the 2600 cycle tone on Hanna's line originated from his line by a 'blue box' and, second, a connection was completed. (R. 43, 44). Thus the tape recorder operated only for 35-45 seconds on each call. Naturally, the tape was made to preserve the evidence of fraud.[1]

box' was being used and notified Doyle. (R. 45, 46, 83, 84). The detec-

tion unit, counter and unattended recorder remained on Hanna's line sporadically for twenty-three of the next twenty-six days until on December 21, 1965, Doyle received a subpoena directing him to produce all the recordings before a Federal Grand Jury in Philadelphia, Pa. (R. 46-49, 296). He appeared the following day and turned the tapes over to the Grand Jury. (R. 57). This is the first time anyone in the Federal Government had knowledge that Hanna's line was being monitored. (R. 50).[2] Attorneys for the United States Department of Justice handling the Philadelphia Grand Jury turned the tapes over to the Federal Bureau of Investigation. The tapes were in turn given to Special Agent William Heist in Miami who contacted Doyle on December 30, 1965. (R. 61). This is the first time Doyle was ever contacted by an agent of the Federal Government relating to this matter (R. 50, 51, 61, 94) and he never did tell anyone outside the Grand Jury what was on the tapes. (R. 57)."[3]

"Based on the conversations contained in the tapes, Heist and Special Agent Maurice Roussell obtained a search warrant for Hanna's home and an arrest warrant for his person. (R. 91). Heist also determined that defendant Modell was one of the people

1. We have some reservations as to the facts and conclusions set forth in the Government's footnote 3, which we discuss in footnote 15, infra. The accuracy or inaccuracy of those facts and conclusions would not, in our opinion, affect the decision of this case.

2. The truth vel non of this sentence would not affect our decision. However, for the sake of accuracy, we note that we do not agree with this statement. It is based on the testimony of one telephone company employee to the effect that that was his first contact with any Government agency. Asked if he knew how the Government got the information that he had these tapes in his possession, he testified, "No, sir, I do not. But I will say this: during the course of this case my superiors were constantly being in-

formed of the progress of the case on a weekly basis. But I had no contact with any federal agent or agency." The only reasonable inference to be drawn is that prior to the issuance of the subpoena duces tecum, the existence and some inkling of the contents of the communications were disclosed to the Government by some telephone company employee. The Government virtually admits as much in its supplemental brief, p. 7: "* * * if such disclosure is not permitted it is inconceivable to perceive how the Grand Jury or other lawful authority would learn of the existence of the records which the statute allows them to demand."

3. We accept these statements subject to the qualification in our footnote 1, supra.

called by Hanna in New York City. (R. 87, 92, 160). Because the conversations between Hanna and Modell revealed they were engaged in the use of interstate facilities in aid of bookmaking, as they later admitted by stipulation, arrest and search warrants were also issued against defendant Modell and his apartment. On January 8, 1966, agents of the Federal Bureau of Investigation executed the warrants and bookmaking paraphernalia was seized at both places. The 'blue box' was seized at Hanna's residence. (R. 100)."

We adopt also the further statement contained in the brief for appellants:

" * * * The tape recordings and gambling paraphernalia constituted all the evidence against the defendants in the instant case (R. 294).

"The defendants filed a pre-trial motion to suppress the tape recordings, bookmaking, paraphernalia and the 'blue box' on the ground that they were obtained in violation of 47 U.S.C. § 605, and the Fourth Amendment to the United States Constitution (R. 178–179.) The lower court denied the motion and filed a written opinion which is now recorded at 260 F.Supp. 430 (S.D.Fla.1966) (R. 292–293, 294, 306). The lower court adjudged the defendants guilty based on the evidence sought to be suppressed in this case (R. 314–315).

"The defendant Hanna moved to dismiss the first count of the indictment on the ground that it failed to state an offense under 18 U.S.C. § 1343 (R. 227–228). The lower court denied the motion (R. 293)."

In accordance with Fifth Circuit Rule 24–2(b), the appellants filed the following:

"SPECIFICATION OF ERRORS RELIED UPON

"I

"THE LOWER COURT ERRED IN DENYING THE DEFENDANTS' MOTION TO SUPPRESS (a) THE TAPE RECORDING OF THE DEFENDANTS' MONITORED TELEPHONE CONVERSATIONS AND (b) GAMBLING PARAPHERNALIA FOUND IN CONSEQUENCE THEREOF, ON THE GROUND THAT THE EVIDENCE WAS SECURED IN VIOLATION OF 47 U.S. C. § 605.

"II

"THE LOWER COURT ERRED IN DENYING THE DEFENDANT HANNA'S MOTION TO DISMISS COUNT ONE OF THE INDICTMENT ON THE GROUND THAT SAID COUNT OF THE INDICTMENT FAILED TO STATE A CRIME UNDER 18 U.S.C. § 1343."

The second specification may be disposed of summarily. If the first specification is sustained, both judgments of conviction must be reversed entirely. If the first specification is not sustained, the judgments must be affirmed. Since the sentences were to run concurrently, it is not necessary to consider questions raised with respect to any one count.[4]

Thus our consideration is limited to the question of whether the defendants' motion to suppress the tape recordings, bookmaking paraphernalia and the "blue box" should have been sustained because they were obtained in violation of 47 U.S.C. § 605.[5] That question may be

---

4. Hirabayashi v. United States, 1943, 320 U.S. 81, 85, 63 S.Ct. 1375, 87 L.Ed. 1774; Mishan v. United States, 5 Cir. 1965, 345 F.2d 790, 791.

5. "§ 605. *Unauthorized publication or use of communications*
    "No person receiving or assisting in receiving, or transmitting, or assisting in

transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such

further limited to: "Was the evidence obtained as a result of violating 47 U.S.C. § 605?"[6]

Four other district courts have held that similar evidence was not obtained in violation of the statute.[7] Of two very recent cases at the appellate level, one has agreed with the district courts while the other has held the evidence inadmissible.[8] We agree with most, but not all, of the opinion of the Ninth Circuit in *Bubis*, infra note 8, and we think that its decision that the evidence was inadmissible is in accord with the opinions of the Supreme Court cited in footnote 6, supra.

The *Bubis* opinion follows the dichotomy of section 605 employed in the first *Nardone* opinion:

> "Section 605 of the Federal Communications Act provides that no person who, as an employe, has to do with the sending or receiving of any interstate communication by wire shall divulge or publish it or its substance

to anyone other than the addressee or his authorized representative or to authorized fellow employes, save in response to a subpoena issued by a court of competent jurisdiction or on demand of other lawful authority; and 'no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person.' Section 501 penalizes wilful and knowing violation by fine and imprisonment.

"Taken at face value the phrase 'no person' comprehends federal agents, and the ban on communication to 'any person' bars testimony to the content of an intercepted message. Such an application of the section is supported by comparison of the clause concerning *intercepted messages* with that relating to *those known to employes* of the carrier. The former may not be divulged to any person, the latter may be divulged in answer to a lawful sub-

---

communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not

entitled thereto: *Provided,* That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress."

6. See Nardone v. United States, 1937, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314, on second appeal, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; Weiss v. United States, 1939, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed.2d 298; Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322; Benanti v. United States, 1957, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed. 2d 126; Rathbun v. United States, 1957, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134.

7. See Beckley v. United States, N.D.Ga. 1966, 259 F.Supp. 567; United States v. Benjamin Lassoff, No. 28247, E.D.La., 1962; United States v. Henry Loman, et al., No. 36270, S.D.Cal., July 1966; United States v. Thomas McCay, et al., No. 66–76 CR, W.D.Okla., June 1966. Only *Beckley*, supra, and the instant case are reported.

8. Brandon v. United States, 10 Cir. 1967, 382 F.2d 607; Bubis v. United States, 9 Cir. 1967, 384 F.2d 643.

poena." (Emphasis added.) 302 U.S. at 380, 381,[9] 58 S.Ct. at 276.

■ To include telephone security personnel charged with the detection of fraud on the carrier within the class of employees receiving or transmitting communications would require too strained a construction. In a broad sense all telephone employees assist in receiving or transmitting communications, for that is the end result of the telephone company's business. But, as the first *Nardone* appeal indicates (see 302 U.S. 381, 58 S.Ct. 275), this first clause of section 605 has reference to those employees to whom the communications necessarily become *known*. In fact, here the communications were sent and received by means of direct dialing without the use of a telephone central or other employee. There were *no* employees or persons whose transmitting and receiving duties permitted them to learn the contents of the telephone conversations. The first clause of section 605 therefore has no application to the facts of this case.[10]

■ Parts of the telephone conversation were "intercepted" and their admissibility must be determined by reference to the second clause of section 605. The second clause is in the most positive and explicit language: "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." That clause simply means what it says and says what it means. The first *Nardone* case, supra note 6, refers to it as a "plain mandate" (302 U.S. at 383, 58 S.Ct. at 275), and holds that "no person"

embraces federal agents engaged in the detection of crime. A fortiori that expression embraces the security personnel of a telephone company.

That is made more certain when we turn from the literal language of section 605 to its purpose and intent as stated in the first *Nardone* appeal:

"It is urged that a construction be given the section which would exclude federal agents since it is improbable Congress intended to hamper and impede the activities of the government in the detection and punishment of crime. The answer is that the question is one of policy. Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty. The same considerations may well have moved the Congress to adopt section 605 as evoked the guaranty against practices and procedures violative of privacy, embodied in the Fourth and Fifth Amendments of the Constitution." 302 U.S. at 383, 58 S.Ct. at 277.

Again, the second *Nardone* case referred to the first, as follows:

"That decision was not the product of a merely meticulous reading of technical language. It was the translation into practicality of broad considerations of morality and public well-being. This Court found that the logically relevant proof which Congress had outlawed, it outlawed because 'inconsistent with ethical standards and destructive of personal liberty.' 302 U.S. 379,

---

9. Also in Weiss v. United States, supra note 6, the Court employed a like dichotomy:

"The section consists of four clauses separated by semicolons. The pertinent one is the second: 'and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communi-

cation to any person;'." 308 U.S. at 327, 60 S.Ct. at 271.

10. If we held otherwise, we would then reach the question pretermitted by the Supreme Court in Benanti, supra note 6, 355 U.S. at 100, n. 5, 78 S.Ct. at 155, and in Rathbun, supra note 6, 355 U.S. at 108, n. 3, 78 S.Ct. at 161, as to whether both an interception and a divulgence are necessary for a violation of section 605.

383, 58 S.Ct. 275, 277, 82 L.Ed. 314." 308 U.S. at 340, 60 S.Ct. at 267.

Adding to the language of the Supreme Court the italicized expressions enclosed in parentheses, we would say the "Congress may have thought it less important that some offenders should go unwhipped of justice *(and that the telephone company lose some long distance tolls)* than that officers *(or telephone company employees)* should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty."

■ There is some suggestion that, by his illegal use of the telephone company facilities, Hanna impliedly "authorized" the interception of any communication. That position is untenable. It would justify the violation of the secrecy of communication by the results obtained from the violation. By analogy to the search and seizure cases under the Fourth Amendment that is, of course, impermissible. [11] If sound, that suggestion need be but slightly modified to render admissible in evidence all intercepted telephonic communications having to do with the planning or effectuation of crime. In discussing the phrase "authorized by the sender," the Supreme Court has said: "The Act contemplates voluntary consent and not enforced agreement to publication." Weiss v. United States, supra note 6, 308 U.S. at 330, 60 S.Ct. at 272.

The Government's main thesis is thus expressed in brief:

"The crux of this appeal is whether trespassers on the facilities of a communications common carrier and thieves of its services are entitled to the privacy afforded by Title 47, U.S.C. § 605. Common sense dictates that Congress did not intend to protect trespassers and thieves."

That seems to be the basis of the Tenth Circuit's decision in *Brandon,* supra note 8, when that Court says:

"That provision was adopted by Congress for the protection of authorized users of telephonic or radio facilities; it was not intended as a refuge for the wrongdoer who uses the telephone in a scheme to violate the wire fraud statute." 382 F.2d at 611.

We do not agree.

As the Supreme Court pointed out in both *Nardone* appeals, Congress intended to protect "against practices and procedures violative of privacy," and against "methods deemed inconsistent with ethical standards and destructive of personal liberty." (302 U.S. at 383, 58 S.Ct. at 277.) If the protection of the law abiding requires the protection of all telephonic users including "trespassers and thieves" and other criminals, the answer is that it is for Congress to declare which is the more important policy.

The Government's attempted analogy between persons attempting to defraud the carrier of its long distance tolls and trespassers on land is patently unsound. The argument need be but slightly changed to treat as "trespassers" all persons using or misusing the telephone to plan or effectuate crime. If not, the argument would result in attaching more importance to a minor fraud than to the most heinous felony. Such a construction would render the statute no longer "a plain mandate." [12] The argument would permit telephone company personnel to conduct pervasive wire tapping invasive of the privacy of the lawless and law-abiding alike, and then to make use of the fruits of their conduct in those cases in which the results showed that one of the parties to the telephone conversation was attempting to commit a fraud on the telephone company.[13] Incidentally, the Government's position takes no

---

11. See Byars v. United States, 1927, 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520.

12. "Moreover, as the second *Nardone* decision asserts, distinctions designed to defeat the plain meaning of the statute

will not be countenanced. 308 U.S. 338, 340, 60 S.Ct. 266, 84 L.Ed. 307." Benanti v. United States, 1957, 355 U.S. 96, 100, 78 S.Ct. 155, 157, 2 L.Ed.2d 126.

13. See footnote 11, supra.

account of the user at the other end of the line who may be innocent of that particular type of criminality. In the present case, there is no evidence that Modell knew that Hanna was using a blue box.[14]

Basically, the Government's argument in this case is but a watered down version of its argument in *Nardone* and the subsequent cases cited in footnote 6, supra. The Supreme Court has consistently rejected the Government's position, and we can do no less.[15]

As indicated in footnote 14, supra, this opinion had been drafted and circulated among the Judges before the Supreme Court's decision on December 18, 1967 of Katz v. United States. That decision goes much further than to reinforce our view that the tape recordings were inadmissible against Modell. It makes clear that they were entirely inadmissible. There the Supreme Court definitely overruled Olmstead v. United States, 1928, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, which was the occasion for the enactment of the statute now carried forward as 47 U.S.C.A. § 605.[16]

*Olmstead* being overruled, section 605 may not now appear necessary. Certainly the statute cannot authorize a violation of the Fourth Amendment as now declared in *Katz*, supra. Section 605 cannot authorize the telephone company employees to obtain evidence through surveillance which becomes under *Katz* standards an unconstitutional search; nor can the Government by subpoena duces tecum make use of such evidence. *Katz*, points out the constitutional procedure as the time-honored method of obtaining a search warrant.[17] Moreover, the fact that a search warrant is not available to the telephone company[18] adds emphasis to the illegality, indeed unconstitutionality, of its surveillance which amounted to a search without a warrant.

The district court erred in denying the defendants' motion to suppress the tape recordings of the defendants' monitored telephone conversations and the gambling paraphernalia found in consequence of those tape recordings. The judgment is therefore reversed with directions to

14. It is significant that in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576, decided December 18, 1967 (after this opinion had been drafted and circulated among the Judges), the Government was permitted to introduce evidence of *Katz's end* of the telephone conversations. There was apparently no effort to introduce evidence of the other end, which would correspond here to Modell's end of the conversations.

15. We have not discussed, but neither have we failed to consider, the plight of the telephone company. We recognize that, as a public utility, it had not only the right but the duty to require payment of the long distance tolls prescribed in its tariffs. If this decision renders the performance of that duty more difficult, our answer is that the policy is for Congress to declare. However, we are not convinced that the telephone company will be seriously impeded. As previously indicated (*ante*, note 1), we do not accept at face value all that the Government says in footnote 3 to its brief. It seems to us that the use of the blue box detection unit with the peg counter meter, *but without the tape recorder*,

would have given the telephone company adequate protection. With information thus lawfully obtained, a routine inspection might have resulted in the discovery and removal of the blue box. The telephone company might also have reported to appropriate governmental authority the probable commission of a crime, following which the Government might have obtained a search warrant for the electronic search, as now authorized by the recent *Katz* decision referred to in footnote 14, or even for the blue box itself. A search warrant is of course not available to the telephone company. See 47 Am.Jur., Searches and Seizures, § 4, p. 504, § 56, pp. 536, 537; 79 C.J.S. Searches and Seizures § 63, p. 825.

16. See Nardone v. United States, supra note 6, 302 U.S. at 382, 58 S.Ct. at 275, 383; Rathbun v. United States, supra note 6, 355 U.S. at 111, 112, 78 S.Ct. at 161 (concurring opinion of Justice Frankfurter).

17. See particularly footnote 16 to Katz v. United States, supra.

18. See authorities cited at end of footnote 15, supra.

render judgment discharging the defendants.

Reversed with directions.

GODBOLD, Circuit Judge (specially concurring):

I concur in the result.

As Judge Rives notes (footnote 2 of his opinion) the only reasonable inference is that prior to the issuance of the subpoena duces tecum the existence and some inkling of the contents of the communications were disclosed to the government by telephone company employees. Under no construction of § 605 is this proper.

The wiretap was installed on Hanna's telephone on November 24, 1965. It remained there to December 21, although the telephone company knew within a day or two of installation that Hanna was using a device to bypass the telephone company's long distance toll equipment. Whatever right the telephone company may have to determine the existence of communications [1] or the content of communications is limited by standards of reasonableness which were exceeded in this case. Bubis v. U. S., 384 F.2d 643 (9th Cir. 1967).

For these reasons, and these alone, I agree that these cases must be reversed.

HUGHES, District Judge (dissenting).

I respectfully dissent from the majority and would affirm the judgment of the trial court.

I agree with the majority that "our consideration is limited to the question of whether the defendants' motion to suppress the tape recording, book-making paraphernalia and the 'blue box' should have been sustained because they were in violation of 47 U.S.C. sec. 605." In my opinion the evidence was not obtained as a result of violating 47 U.S.C.

sec. 605 and the trial court was correct in overruling defendants' motion to suppress.

By enacting the first clause of section 605, Congress recognized the special position of the carrier's employees. This clause does not proscribe the interception of communications by a " * * * person * * * assisting in receiving * * * or assisting in transmitting * * *." Apparently, the majority interprets this phrase to include only employees who in actually placing the call obtain knowledge of the communication. In my view such a restrictive construction is contrary to the intent of Congress.

Section 605 was enacted in 1934, long before it was technically possible for toll-charge telephone calls to be completed without the assistance of some human agency. At that time an operator's "interception" was necessary in order properly to assess toll charges for long distance calls. In recent years the company has developed a means of placing calls and assessing charges without the aid of an operator. The new system, while affording a greater measure of privacy to the user than the old system, provides less security to the telephone company, since by using a "blue box" a caller may electronically circumvent the new billing system.

In an effort to combat this practice and thus be assured of compensation for the use of its lines, the telephone company has had to take certain security measures. Since the "blue box" emits a 2600 cycle tone when in use, the company has developed a means of electronically sensing its emission. The frequent appearance of such a tone on a particular line is a strong indication that a "blue box" is being used. Before any degree of certainty can be achieved, however, it is necessary to have more substantial evidence. This is obtained by the Company's security personnel attaching a tape

---

1. Judge Rives' opinion focuses on the content of a communication. Sec. 605 refers also to divulging the existence of a communication, which may be done by mechanical devices that do not record the content. But I assume that such devices would be installed by and read by persons who are not in the status of the old-fashioned "central."

recorder to the suspected line to verify that a "blue box" is in fact being used.

I would interpret the first clause of section 605 to include security officers as well as other employees of the carrier who are engaged in keeping the business of telecommunications functioning properly. The operator is only one of many employees who in the proper exercise of their duties necessarily must "intercept" transmissions. In view of recent inventions, it is irrational to differentiate the legal effect of the operator's function from that of the security personnel. To some extent the security officer has taken over the function of the operator in making certain that toll charges are properly assessed. Consequently, the statute should apply to him in the same way as it formerly did to the operator. Otherwise, the carrier, by using an electronic complex for the purpose of assessing charges, has lost the right of interception which formerly he had.

Since it is my opinion that a security officer, in the light of present day developments, should be included among company employees engaged in the transmission of communications, information obtained by him in the regular course of his duties with the telephone company can be divulged, if done in accordance with the conditions set forth in the first clause of the statute, *viz.* " * * * in response to a subpoena issued by a court of competent jurisdiction, or on demand of other lawful authority * * *." The testimony in this case reveals that the manner of divulgence was in accordance with this provision of the statute, as is set forth in the statement of the facts in the majority opinion. Thus the first clause of section 605 does not prohibit the introduction into evidence of the tape recording.

The second clause of section 605 covers persons other than employees " * * * assisting in transmitting * * *." It provides that " * * * no person not being authorized by the sender shall intercept * * * and divulge * * * the contents * * * of such intercept-

ed communication." In my opinion the transmissions here under scrutiny are not entitled to the protection of this clause of the statute.

The telephone calls between Hanna and Modell were intrinsically illegal transmissions. It is not their content which made them so, but the fact that Hanna and Modell were fraudulently using the lines without paying for their use. The majority assumes that Congress intended to protect against the monitoring and divulgence of fraudulent transmissions as well as legal ones, but I am unable to make that assumption.

No worthwhile purpose is served by protecting the secrecy of such transmissions, and to do so would seriously inhibit their detection. It is difficult to believe that Congress intended that outlaw transmission should have protection. "It is," as stated in Brandon v. United States, 382 F.2d 607, August 29, 1967, 10th Circuit, "contrary to common sense."

The leading case which sustains the view that, if the use of a communication facility is illegal, the right of privacy does not exist and the matter may be divulged, is Sugden v. United States, 226 F.2d 281 (9th Cir. 1955) affirmed per curiam, 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449.

*Sugden* involved the interception and monitoring of radio transmissions by federal agents. Information obtained in this manner was used as evidence in prosecuting defendants for violation of the immigration laws. Although defendants were not licensed operators and were not thus legally on the air, they sought to interpose section 605 in a motion to suppress the evidence. The trial court granted the motion and dismissed the indictment, but the Ninth Circuit reversed, holding that because the defendants were not legally using the station the statute had no application. The Court declared:

* * * To throw a mantle of protection provided by Section 605 over an outlaw broadcast is to abandon rea-

son. \* \* \* Giving the one who broadcasts without authority any protection under Section 605 could not tend to protect the means of communication.

The case of Brandon v. United States, supra, likewise sustains this view. In that case the defendants were accused of conspiring to defraud the Southwestern Bell Telephone Company in the use of long distance telephone service and facilities. The means of detection were similar to that used in the present case. The Court in holding that section 605 did not prohibit the use of information obtained by monitoring said:

> (Section 605) \* \* \* was adopted by Congress for the protection of authorized users of telephone or radio facilities; it was not intended as a refuge for the wrongdoer who uses the telephone in a scheme to violate the wire fraud state.

The majority suggests, assuming *arguendo* that the tapes are admissible against Hanna, that they cannot be introduced against Modell because there is no evidence that he participated in the wire fraud, citing Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, decided December 18, 1967, as controlling. However, I do not believe *Katz* to be analogous. That case censured eavesdropping by *federal agents* as constituting a violation of the defendant's Fourth Amendment rights against unlawful search and seizure. But the Fourth Amendment is no bar to eavesdropping by persons such as these telephone company employees; it applies only to acts of the government. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048. The evidence demonstrates that the government played no part in the "interception" here complained of. Moreover, since I find no violation of Sec. 605 in obtaining and divulging the statements of Modell, there is no legal impediment to their admissibility against him.

For the reasons stated I would affirm.

## ORDER GRANTING REHEARING

### PER CURIAM:

The panel of this Court, before which this case was heard, on its study of the appellee's petition for rehearing en banc concludes to grant rehearing before said panel, to be submitted on briefs.

It is therefore ordered that rehearing before the panel of this Court which heard the case on original hearing is hereby granted, to be submitted on briefs; the appellee's brief to be filed within twenty (20) days from the date of the filing of this order and the appellants' brief to be filed within fifteen (15) days from the date of the receipt of copy of appellee's brief on rehearing. The Court suggests that the briefs to be filed may freely refer to briefs already on file and avoid unnecessary duplication. Briefs need not be printed but at least four (4) legible copies shall be filed with the Clerk.