**UNITED STATES of America,**
**Appellant,**

v.

**Robert V. H. SUGDEN and Jean S.**
**Sugden, Appellees.**

**No. 14405.**

United States Court of Appeals
Ninth Circuit.

Sept. 30, 1955.

As Modified on Denial of Rehearing
Nov. 10, 1955.

**282**

Jack D. H. Hays, U. S. Atty., William A. Holohan, Asst. U. S. Atty., Phoenix, Ariz., Warren E. Baker, Gen. Counsel, F. C. C., Washington, D. C., for appellant.

Snell & Wilmer, Phoenix, Ariz., Bryant W. Jones, Yuma, Ariz., for appellees.

Before STEPHENS, FEE and CHAMBERS, *Circuit Judges.*

CHAMBERS, Circuit Judge.

Robert V. H. Sugden is a cotton farmer farming in Arizona near Yuma. His wife Jean assists him in the operation, at least as far as operating their farm radio station is concerned.

On October 7, 1953, Mr. and Mrs. Sugden were jointly indicted for conspiracy to violate the immigration laws. Also, Mr. Sugden alone was indicted for con-cealing and shielding illegal entrants into the United States from detection. The charges revolve around allegations of employing Mexican nationals, commonly called "wetbacks," on the Sugden farm. It is alleged that they took various steps to hide the illegal entrants and avoid being caught with them in their employ.

Consideration of the case will be shortened if, for the discussion of the case, it is assumed the Sugdens are guilty as charged. Of course, this may not be true at all.

The *legally offensive events began in* August, 1953, and seem to have culminated on September 18 of the same year.

In the matter of detection, of coaxing witnesses to speak freely upon interrogation before indictment and before trial, the government was materially aided by the fact that one Robert J. Stratton, an engineer from the Los Angeles office of the Federal Communications Commission, in early September had come into the Yuma area with monitoring devices. With an assistant, Stratton located the Sugdens' short wave transmitter. He listened to their broadcast instructions to the overseers in the fields. Apparently some of the instructions involved secreting Mexican nationals, illegally entered, from detection by United States immigration officials. An office of the Immigration Service was located in the town of Yuma and its officers patrolled the area.

The legal requirements for a farmer to operate his own radio station for farming purposes are minimal. He must have a license for his stationary transmitting set and any base operator must have a license.[1] It seems none is required for the operator of the mobile end of the two way radio apparatus. See 47 C.F.R., Chap. I, Parts 11 and 13. Licensing is perfunctory. The licensees must not have been convicted of a felony, etc. Ordinarily the salesman who sells

---

1. Apparently such an operator gets a restricted radio telephone operator's permit.

the radio equipment to the farmer can handle the necessary paper work for the farmer to obtain his station and operators licenses. At all times when Stratton was monitoring, Sugden's station was licensed. But the operators licenses of Mr. and Mrs. Sugden did not arrive or were not effective until September 17, 1953. They had failed to fill out some blank in their application for operators licenses and so there was delay. The Sugdens make much of the fact that they were honestly trying to get licenses before September 17. On this point, it must be said that they were either licensed or unlicensed. Their good intentions could not serve as a substitute for licensing.

Returning to the subject of Stratton's listening, it should be related that he overheard broadcasts of Mr. or Mrs. Sugden which concerned the matter of secreting the wetbacks on September 9, 10 and 18, 1953. Some of the broadcasts were recorded by Stratton. On others he made notes. The contents of all apparently were made available to the Immigration Service and the district attorney. Also, considerable use was made of the broadcast matter before the grand jury.

At the threshold of trial on separate indictments which were consolidated for trial, the defendants moved to suppress the evidence obtained from Stratton's monitoring of the Sugden broadcasts. A hearing was had inquiring into the circumstances of Stratton's activities and the involvement of his evidence in the case. Most of the facts elicited are summarized hereinabove. During the hearing the Sugdens' counsel said: "If it please the court, I believe that counsel indicated this morning that the government has made substantial use of these transcripts in the preparation of the cause, and that the government proposed to substantially rely upon the testimony of Mr. Stratton in the presentation of its case." And the prosecutor replied: "That is a correct statement, counsel."

The trial court was of the opinion that the government's activities in developing and prosecuting the case ran counter to 47 U.S.C.A. § 605 and granted the motion to suppress. Also, the trial judge quashed the indictments. The government's concession, above quoted, was a factor in quashing of the indictments and suppressing the evidence.

Section 605, above mentioned, reads as follows:

"Unauthorized publication or use of communications

"No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such informa-

·tion was so obtained, shall divulge or publish ·the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use ·the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: Provided, That this section shall not apply to .the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress."

The government must concede that if the facts were the same save that Stratton had tapped the Sugdens' telephone line and .obtained the same information without the Sugdens' consent as he did by monitoring the air waves, then the trial court's rulings were correct. Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298. But the government says listening on the air and wire tapping are different. Therefore, it appeals to this court. It thinks the fact that Stratton had a legal duty to listen in order to find illegal operations under the Federal Communications Act entitled him to turn the information over to other agencies of the government. Also, it is argued in the government's unusually excellant brief that picking up an. air wave message and disseminating it as Stratton did is not an interception, is legal and something that Stratton surely and maybe any citizen could do anyway.

■■■■ Perhaps a few background matters should be disposed of first. It is well to note that the defendants do not contend there was a violation of the Fourth Amendment. or the Fifth. This is for the reason that Olmstead v. United States, 277 U.S.. 438, 48 S.Ct. 564, 72 L.Ed. 944, is assumed to be the law. of the land still. Second, it is to be observed that Section 605 nowhere within its own corners is designated as a rule of evidence. It has certain civil and criminal significance by virtue of. other sections of the Federal Communications Act. 47 U.S.C.A. § 153 et seq. It becomes, however, a rule of evidence for federal courts. by judicial construction. Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314. Further, Section 605 has applicability to intrastate messages as pointed out in Weiss v. United States, supra.

■■■■ It seems implicit in the act that agents of the Federal Communications Commission can do some "spying" on the air waves, i. e., intercept.[2] The Commission is charged with enforcing the act. Except by listening, how can the Commission tell with certainty that a station is using its assigned frequency?

The purpose of Section 605 is generally said to be to protect the "means"[3] of interstate communication. Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322. At first look, it is difficult to see how a man with a farm radio has any privacy and how silencing him who hears conversations on the farm radio protects any privacy or the means of communication. However, the very limited privacy which Section 605 gives the user of radio for communication may

2. A good note on the meaning. of "interception" is to be found in 54 Michigan Law Review, 623 (February, 1955). Section 153 of the Act, 47 U.S.C.A. § 153, pinpoints the definition of wire communication as "between the points of origin and reception". The quoted words take on significance in the cases of recordings of telephone conversations and in the case of a person disclosed to only one converser who listens on an exten-·sion line or sits beside a party to the conversation and overhears. Such cases are collected in Flanders·v. United States, 6. Cir., 222 F.2d 163.

The same Section 153, defining "radio communication," does not mention the elements of points of origin and reception.

In this court's view on radio, except as to a public broadcast anyone who listens intercepts if he is not a party. to the communications or is not with a party.

3. Herein, we consider the "means" as licensed stations manned by licensed operators.

tend to encourage the dispatch of messages via radio over and above the use that would be made of the means if personal messages were part of the public domain available tomorrow, for example, for the commercial purveyor of gossip.

While the telephone does have more privacy than private radio, yet we think that the government agent who monitors cannot make use of the fruits of his monitoring if he finds the station legally on the air and the persons using the station legally authorized to operate it. That is, he can listen for the purpose of enforcing the act and make such use of the information as tends to enforce the act.

Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, and the two cases of Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 and 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, announce rules of evidence which it is assumed Congress may change.

We think here that unless the Congress orders otherwise, the exclusionary rules of Weiss and Goldman, supra, are to be applied to listening in (at least at a point away from the sender and receiver and without the consent of either) on non-public broadcasts by both private individuals and all public officers save in connection with the Federal Communications Commission's necessary policing for violation of the act. And in connection with such policing, information can be used no further than to effect the policy of the act by criminal prosecution thereunder or by use of other appropriate procedures.

The theory of conduct of the officers in the field in the instant case (although it is said that the Immigration Service did not have the equipment to listen to Sugden's radio) seems to have been, "The Federal Communications Commission can legally listen. So we shall use their ears for what we, the Immigration Service, cannot do." In view of Section 605,

we think that if Congress wants the Federal Communications Commission to go into the general crime detection business it should say so. If it wants to authorize the Immigration Service to listen,[4] we assume it may do so. We shall not put either agency there by judicial construction.

Here in Sugden's case a special situation exists as to all of his and Mrs. Sugden's broadcasts save one day's. Although the station was licensed, the two Sugdens were not licensed operators until September 17th. Therefore, they were not legally using the station before September 17th. To throw a mantle of protection provided by Section 605 over an outlaw broadcast is to abandon reason. Therefore, we hold that as to private radio communications, before any right of privacy exists under Section 605 the voice must be legally on the air; othewise one who hears, and especially the Federal Communications Commission, may make full disclosure. Giving the one who broadcasts without authority any protection under Section 605 could not tend to protect the means of communication.

Even though divulgence of the content of unlicensed broadcasts is not prohibited by Section 605, there was no attempt in the hearing before the trial court to distinguish between the use made of messages intercepted before September 17th and what was heard thereafter.

It is this court's view that the trial court should reexamine the motions of defendants on the basis that free use of any radio communications made before September 17th can be made. The district court will need a new hearing before ruling on the suppression of evidence and quashing the indictment. And possibly the court may want to exercise its power to open up the proceedings of the grand jury before it rules on dismissing the indictments.[5] The last-mentioned matter will involve the use of

---

4. That is, listen and divulge.

5. This court is without knowledge of whether or not grand jury proceedings are stenographically reported in the District of Arizona.

a wise discretion, depending on how the hearing otherwise develops.

Prima facie, the general thesis this court adopts may seem absurd. It may be said that with radio he who broadcasts, in the very nature of things, has no privacy. It may be said that shutting the government's mouth if it listens to the radio in no way protects the means of communication, that is, the instrumentality which is said to be the object of Section 605. If such be true and the end result be not desirable, then the appeal should be made to the Congress. Too much case law already has been built up in the telephone cases for this court to act as a free agent now.

The orders dismissing the causes and suppressing evidence are reversed for proceedings not inconsistent with this opinion.