[Crim. No. 25884. Second Dist., Div. Three. Apr. 29, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LEE MAHONEY, SR., Defendant and Appellant.

**COUNSEL**

Herbert Dodell for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**POTTER, J.**—By an information filed by the District Attorney of the County of Los Angeles, defendant was charged with a violation of section 502.7, subdivision (a) (4), of the Penal Code (fraudulently avoiding a lawful charge for telephone service by rearranging, tampering with or making connection with telephone facilities). Appellant pleaded not guilty and made a motion to suppress evidence under Penal Code section 1538.5. After a hearing, this motion was denied. Thereafter the information was amended to delete the allegation that the phone services obtained in violation of the section aggregated "over $200.00 with[in] a 12 consecutive month period" (which would make the offense a felony under subd. (f) of § 502.7) and to add a count II alleging violation of subdivision (b) of section 502.7 (making, possessing, selling or otherwise transferring a device used to avoid lawful telephone toll charges).

Defendant pleaded guilty to both counts as amended. The proceedings were suspended as to each count and defendant was granted probation for a period of three years, after both offenses were declared misdemeanors.

Defendant has appealed from the judgment (order granting probation) to review the denial of the motion under section 1538.5, pursuant to *subdivision* (m) of said section.

*Facts*

The offenses with which defendant was charged were the use and manufacture of multifrequency signal generators designed to enable the user to circumvent the telephone company's billing equipment and thereby avoid long distance toll charges. The device, commonly referred to as a "blue box," is capable of emitting audio signals at various frequencies, duplicating those generated in the telephone company's long distance network in the completion of long distance calls. Once the user has entered the long distance network by dialing a toll free (800) long distance number, the blue box, by sending a 2,600 cycle tone, disconnects the terminal portion of the long distance train but retains a connection to the long distance network. Then a different frequency signal commanding the equipment to receive additional instructions is sent. Following this, a series of signals corresponding to the numerical components of the desired number are transmitted by the blue box and ultimately a terminal signal telling the equipment to execute the call to the new number is sent.

The user avoids toll charges through this method by virtue of the fact that the local billing equipment collects and stores only the initial directly dialed numerical signal, in this case a toll free 800 number. If the covert number is answered, the billing equipment records completion of the call and its duration but no charge therefor is included in the bill sent to the subscriber.

On March 5, 1973, Walter P. Schmidt, a special agent for the General Telephone Company of California, received a tip from a security agent of the Southern Bell Telephone Company in Atlanta, Georgia. This tip was to the effect that a person under investigation for use of a blue box in Georgia reported that a Mr. Lazarus, from whom he had purchased it, advised him defendant was "the person who manufactured and repaired the box." In addition, the Atlanta informant advised Schmidt that defendant was a subscriber of General Telephone Company and gave his phone number.

Schmidt's function as special agent was "to protect the assets of the company" and his assignments included "investigation of toll fraud." To ascertain whether defendant was employing a blue box, Schmidt called for a computer print out of the records routinely kept showing the originating number and the number dialed in all telephone calls from subscribers' phones. These records included the 800 numbers dialed, if

they were long distance, despite the fact that no charge was made therefor. Knowing that 800 numbers are customarily used as a means of entry into a long distance network when toll fraud is accomplished through the use of a blue box, Schmidt obtained and examined the computer print out of all of the 800 numbers called from defendant's telephone from January 10, 1973, through March 21, 1973. This print out showed 134 calls from defendant's number to 800 numbers. One of these numbers, with the prefix 800-654 (assigned to the State of Oklahoma) was shown to have been called 120 times and to have been answered each time with conversations of from one to several minutes in length. This number was, however, a nonworking number, which meant that if the call had not been rerouted after the original dialing from defendant's phone, it could not have been answered. Various other nonworking numbers were similarly reported as having been called and having been answered.

From this print out Schmidt formed the opinion that a blue box was being employed on defendant's phone.

To verify this conclusion, Schmidt attached a dial number printer with a magnetic tape recorder to defendant's line. This equipment had the capability of detecting and recording the original 800 number dialed. This equipment also recognized and printed a record of the 2,600 cycle tone and the subsequent multifrequency signals redirecting the long distance call to a number other than the 800 number dialed. In order (1) to back stop this latter function, (2) to verify the fact that the call was completed by the called party answering, and (3) to identify the calling party (as opposed to the station), the equipment included a magnetic tape recorder which was also activated when and only when the 2,600 cycle tone was transmitted. To permit accomplishment of these three functions, the tape recorder continued in operation for a period of one to one and a half minutes and then automatically shut off until the next 2,600 cycle was transmitted.

The original installation of this equipment continued from March 16 through March 27. During this interval it recorded a very large number of network entries employing the 2,600 cycle signal, a substantial number of which were to the same three stations: an aeronautics school in Tulsa, Oklahoma, an instrument company in Schiller Park, Illinois, and a General Electric Company facility in Bethesda, Maryland. Though the vast majority of these calls did not produce any conversation from

defendant's phone,[1] on at least some of the calls defendant identified himself and explained the operation of the blue box.

Results of Schmidt's surveillance verified his analysis of the original computer information and confirmed that a blue box, or blue boxes, were being used on defendant's phone and that defendant was using such device. The large number of unsuccessful test entries suggested further that defendant was manufacturing the devices and testing them in this fashion.

On the basis of this data, Schmidt prepared a report, stating his conclusion in this respect for the purpose of submitting it to law enforcement agencies. The report was prepared on April 11, 1973, and was submitted to the United States Attorney on April 13, 1973. The United States Attorney declined to prosecute. Thereafter, on May 14, 1973, Schmidt contacted Mr. Ralph Mayer of the Los Angeles County District Attorney's office and told him that, in his opinion, "we had a 'blue box' operating from the specific telephone number." Mayer requested that he be permitted to see the report prepared by Schmidt and it was submitted to him on May 14. Schmidt did not at that time relate any of the conversation recorded between March 16 and March 27.[2]

The surveillance equipment was again attached to defendant's phone line on May 18, 1973, for a period of 48 hours "to check that the fraud was continuing." This surveillance produced additional data of the character obtained in the March 16 to March 27 interval. A further report summarizing the result of this operation was prepared by Schmidt and submitted to Mayer on May 30, 1973. Again no conversation was related in that report.

On August 15, 1973, to confirm "whether the fraud was continuing," the printer portion only of the surveillance equipment was reattached to defendant's telephone line to record each network entry by means of an 800 number followed by redirection of the call through employment of the 2,600 cycle signal. This attachment continued until August 17 (on

---

[1] In some instances the disconnect signal was sent as soon as the called number responded. In other instances the number called responded with a recording inviting the caller to leave his number. Another large group of entries into the network resulted in failures; equipment apparently being tested did not operate satisfactorily.

[2] The first time any information concerning the content of these conversations was delivered to any law enforcement personnel was after a search pursuant to a search warrant had been completed.

which date defendant was arrested incident to a search of his home pursuant to a warrant issued August 16, 1973). Use of the blue box on defendant's phone was thus shown to be continuing.

The warrant was issued by the magistrate on the basis of an affidavit of Joe B. Medina, investigator for the Los Angeles County District Attorney's office, setting forth the above facts but without reference to the content of any of the phone conversations.

The search warrant authorized a search of defendant's house for blue boxes, drawings, parts and tools used in the assembly of such equipment in testing it, as well as records, manufacture instructions for use, and articles of personal property tending to establish the identity of persons in control of the premises and such devices. When this warrant was executed on August 17, 1973, there were numerous items of physical evidence seized, including several blue boxes, a substantial quantity of component parts, testing equipment and records.

In the 1538.5 motion, defendant, without specifying each item, sought to suppress "any information which was obtained from Mr. Schmidt's use of wiretapping equipment." In addition, the motion specifically sought to quash the search warrant on the ground it was obtained on the basis of illegally obtained evidence.

The cross-examination of Schmidt revealed that no application was made to any court for an order to intercept or divulge the contents of any telephone calls emanating from defendant's telephone, and that Schmidt's surveillance was conducted without instructions from the district attorney's office to do so. Mayer, however, had worked with Schmidt on a number of cases and knew "the procedure," that is, that Schmidt attached this special equipment, including a tape recorder, and that he taped telephone calls for use as evidence in subsequent prosecutions. The cross-examination further developed the fact that Schmidt conducted the surveillance "to get enough evidence on Mr. Mahoney to obtain a criminal prosecution."

Defendant contends: (1) there was no adequate basis for the issuance of the search warrant without resort to the information produced as a result of Schmidt's surveillance of his telephone, (2) that Schmidt's surveillance on his telephone was unlawful, and (3) that the use of the information resulting therefrom to further the criminal prosecution of defendant is prohibited by the Omnibus Crime Control and Safe Streets

Act of 1968 (18 U.S.C.A. § 2510 et seq. [18 U.S.C.S. § 2510 et seq.], hereinafter referred to as the "Omnibus Act") and is a violation of defendant's right to be secure against unreasonable searches and seizures guaranteed by the Fourth Amendment to the Constitution of the United States and by article 1, section 13 of the Constitution of California.

## Issues

The issues which are determinative of this appeal are:

1. Did the surveillance conducted by the telephone company, or its disclosure of any information thereby learned, violate the Omnibus Act.

2. Was the use of such information in the procurement of a search warrant by a law enforcement agency an unreasonable search and seizure?

We do not reach the issue posed by defendant's contention that probable cause for the issuance of a search warrant did not exist without the information produced as the result of a surveillance of his phone line because both issues (1) and (2) must be resolved in favor of the People.

*The Telephone Company's Surveillance*
*and Disclosure Were Not Prohibited*
*by the Omnibus Act*

The federal statutes cover in two separate titles the subjects of the interception and disclosure of telephone communications. Section 605 of title 47 of the United States Code provides in pertinent part: "Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by

the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person."

The "chapter 119, Title 18," referred to in section 605 is that portion of the Omnibus Act relating to interception of communications. Included in said chapter are sections 2511 and 2515 of title 18. The pertinent portions of section 2511 are as follows:

"(1) Except as otherwise specifically provided in this chapter any person who—

"(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;

"(b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

"(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

"(ii) such device transmits communications by radio, or interferes with the transmission of such communication; or

"(iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or

"(iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or

"(v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;

"(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having

reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or

"(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"(2) (a) (i) It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication: *Provided,* That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

"(ii) It shall not be unlawful under this chapter for an officer, employee, or agent of any communication common carrier to provide information, facilities, or technical assistance to an investigative or law enforcement officer who, pursuant to this chapter, is authorized to intercept a wire or oral communication."

Section 2515 provides:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

Read together, these three sections make inadmissible any evidence derived from the interception of a "wire communication,"[3] if the

---

[3]"Wire communication" is defined as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire,

interception or disclosure of that information would be in violation of chapter 119.

These federal statutes do not, as defendant suggests, "prohibit the interception or divulgence by *anyone.*" Section 605 does not prohibit divulgence, where such divulgence is "authorized by chapter 119, Title 18." Chapter 119, title 18, expressly authorizes the reception of wire messages by four categories of interceptors. Otherwise it generally requires court authorization from a federal or state court on a showing that such interception "may provide" evidence of the commission of certain offenses. One of the four categories of persons not required to obtain a court order to intercept wire communications is that described in subdivision (2)(a) of section 2511. The authorization stated in that subsection permits agents of communication common carriers not only to intercept wire communications where necessary "to the protection of the rights or property of the carrier"; it also authorizes such agent to "disclose or use that communication." Such agents of common carriers are the only one of the four categories of authorized interceptors who are thus expressly permitted to disclose or use the information.

An examination of the federal decisions, both before and after the enactment of the Omnibus Act, compels the conclusion that the activity of the telephone company in this case was fully authorized.

The decisions prior to the enactment of the Omnibus Act are pertinent because they disclose the state of federal decisional law which was the background of such enactment. The United States District Court decision in *United States* v. *Hanna* (S.D.Fla. 1966) 260 F.Supp. 430, approved the interception and disclosure to law enforcement agents of tape recordings of telephone conversations conducted through the use of a blue box. The court stated the basis of its denial of a motion to suppress in the following language (260 F.Supp. at p. 432):

"Defendants first ask the Court to suppress all evidence of the tape recordings of Hanna's telephone conversations. They contend that the monitoring and subsequent disclosure to the Federal Bureau of Investigation violates Section 605 of Title 47, United States Code and the Fourth Amendment to the United States Constitution. It is the Govern-

---

cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications." (§ 2510.) General Telephone Company is such a common carrier.

ment's position on the other hand, that the telephone company, having ample reasons to believe they were being defrauded, was perfectly within its right in monitoring to determine how, by whom, and of how much, that their subsequent disclosure of the result of their investigation to a law enforcement agency with the obvious hope that the offenders be prosecuted was only logical, and that, as a result, no violation of 605 occurred. Common sense alone would compel me to adopt the Government's view. In addition, however, there is ample authority to support it."

The Court of Appeals for the Fifth Circuit originally wrote its opinion reversing the district court; however, on rehearing, the court changed its opinion and affirmed. In upholding the reasonableness of the telephone company's activities, the court stated: "In footnote 15 to Judge Rives' original opinion, he digressed to explain why he did not think that the telephone company necessarily had to record any parts of the conversations in order to perform its duty to require payment of the long distance tolls prescribed in its tariffs. The telephone company's explanation of its statutory duties and of its procedures in meeting those duties demonstrates the necessity for it to record limited parts of the conversations in order to require payment of the long distance tolls for illegal calls:

" 'No carrier can discriminate between its customers by extending preferential treatment to any. 47 U.S.C. §§ 202, 203(c). Knowingly to allow those committing electronic toll fraud to receive free service would constitute such discrimination. Furthermore, each carrier is enjoined, under pain of criminal penalty, not to neglect or fail to maintain correct and complete records and accounts of the movements of all traffic over its facilities. 47 U.S.C. § 220. Each carrier is also obliged to collect the federal excise tax levied upon each long distance call. 26 U.S.C. § 4251. . . .

" '. . . there is no alternative at this state of the art but to make a limited recording of each illegal call—at least of the fraudulent dialing and opening salutations—to:

(i) identify the calling party (the user of the blue box), and others with whom he may be acting in concert . . . identification of the telephone line from which the fraudulent calls are originating must be followed by the more difficult identification of the specific individual making the calls—this is, of course, of paramount importance;

(ii) establish the location from which the calls are originating;

Most blue boxes, for example, are not cumbersome installations but rather, portable devices (some as small as a pack of cigarettes) which can be readily attached to telephone wires by alligator clips.

(iii) record the multifrequency tones being "dialed" (key pulsed) by the blue box; and

(iv) determine whether the fraudulent call was completed (by the called party answering). (R. 63, 68-70, 81-84, 35-38, 42-45.)

" 'Distance (as well as time) is a factor in determining the proper billing charge for a long distance call. It is, therefore, necessary to ascertain each specific location called after the wrongdoer seizes the circuit.'

"Since it is not shown that the telephone company did more than was necessary for it to comply with the duties imposed by 47 U.S.C. § 220 and 26 U.S.C. § 4251, it does not appear that it exceeded the standards of reasonableness as Judge Godbold had originally thought. Again, the burden of showing prejudicial error has not been sustained by the parties attacking the judgment.

"As to the law, Judge Rives' original opinion was in error in not recognizing what Judge Hughes expressed so clearly in her dissenting opinion:

" 'The leading case which sustains the view that, if the use of a communication facility is illegal, the right of privacy does not exist and the matter may be divulged, is Sugden v. United States, 226 F.2d 281 (9th Cir.1955) affirmed per curiam, 351 U.S. 916, 76 S.Ct. 709 [100 L.Ed. 1449].'

"393 F.2d at 709.

"This Court is bound by the decision in *Sugden* because it was affirmed by the Supreme Court in a terse per curiam: 'The judgment is affirmed.' 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449. The judgment thus affirmed is summarized in the last paragraph of the opinion of the Ninth Circuit as follows: 'The orders dismissing the causes and suppressing evidence are reversed for proceedings not inconsistent with this opinion.'

226 F.2d at 286. That opinion had explained that the operators were not licensed until September 17th, 'Therefore, they were not legally using the station before September 17th.' The opinion had expressed the view, 'that the trial court should reexamine the motions of defendants on the basis that free use of any radio communications made before September 17th can be made. The district court will need a new hearing before ruling on the suppression of evidence and quashing the indictment.' 226 F.2d at 285. Clearly, in affirming the judgment the Supreme Court placed its stamp of approval on that much of the opinion. Indeed, that was the only part of the opinion adverse to the defendants at whose instance certiorari was granted. 350 U.S. 952, 76 S.Ct. 342, 100 L.Ed. 829.

"No sound distinction as to the applicability of section 605 can be drawn between wire and radio. The original statute, written in almost identical terms, applied only to radio communications. Act of Feb. 23, 1927, ch. 169, § 27, 44 Stat. 1162, 1172. Those provisions were extended to wire communications by section 605 without any distinction being made between the two methods of communication. It must, therefore, be conceded that when the use of the communication facility itself is illegal, section 605 has no application, at least insofar as concerns the person guilty of such illegal users. Whatever we might otherwise think, this Court is bound by the *Sugden* decision. Section 605 being inapplicable as to Hanna, the district court properly admitted against him the tape recordings and gambling paraphernalia found as a result of those recordings.

"As to Modell, the case may stand differently. In *Sugden,* supra, the Ninth Circuit commented that, 'It seems none [no license] is required for the operator of the mobile end of the two way radio apparatus.' 226 F.2d 282. That operator, however, was not a defendant, and there was thus no holding that any evidence of the conversation would be admissible against him. Here Modell is a defendant, and, concededly, there was no proof that he knew that Hanna was using the telephone illegally. Since Modell, in the imagery of Sugden, 226 F.2d 285, was 'legally on the air,' section 605 applied as to him. [Fns. omitted.]" (*Hanna* v. *United States* (5th Cir. 1968) 404 F.2d 405, 406-408.)

A like result was reached in *United States* v. *Beckley* (N.D.Ga. 1965) 259 F.Supp. 567. The phone company had monitored defendant's calls and supplied the resulting tapes to the prosecution. The calls in question were made pursuant to an arrangement under which defendant, with the assistance of a phone company employee, was bypassing the toll charges.

The court said (259 F.Supp. at p. 571): "Section 605 does not prohibit the telephone company from monitoring its own lines. The restrictions placed on the telephone company by Title 47 of the United States Code does not deprive the telephone company of the right to employ reasonable means to detect and prevent violations thereof by its own employees. Where, as is here alleged, a corrupt employee allows long distance calls to be covertly made without charge and in a manner which bypasses the regular bookkeeping procedures of the company the only reasonable means of protection is the monitoring of such calls." The court went on to state that the action of the telephone company in divulging what was heard in the monitoring of the calls did not violate section 605.

The only limitation upon such monitoring and disclosure imposed by the federal authorities prior to the enactment of chapter 119 was that stated in the opinion of the Court of Appeals for the Ninth Circuit in *Bubis* v. *United States* (9th Cir. 1967) 384 F.2d 643. The telephone company, which suspected toll fraud, monitored all of the defendant's calls for a period of four months. Defendant's gambling activities were revealed from the content of his conversations which were disclosed to the United States Attorney's office. This resulted in defendant's being prosecuted for violation of the federal statutes against using interstate telephone facilities for gambling. In its opinion, the Ninth Circuit acknowledged the right of telephone companies under section 605 to "take reasonable measures to protect themselves and their properties against the illegal acts of a trespasser" (384 F.2d at p. 648) but ordered suppression of the evidence because (1) the extent of the monitoring "was unreasonable and unnecessary" (384 F.2d at p. 648) and (2) defendant's prosecution for violation of the law against using interstate telephone facilities for gambling "had no relationship to protecting the telephone company's property." (384 F.2d at p. 648, fn. 5.)

■ The enactment of the Omnibus Act did not effect any change in the law affecting adversely the existing authority of the telephone company to intercept or use such information. At page 2182 of 2 U.S. Code Congressional and Administrative News (1968) it is stated: "Paragraph (2)(a) provides that it shall not be unlawful for an operator of a switchboard or employees of a common carrier to intercept, disclose, or use wire communications in the normal course of their employment while engaged in any activity which is a necessary incident to the rendition of his service or the protection of rights or property of the carrier. *It is*

*intended to reflect existing law* (United States v. Beckley, 259 F.Supp. 567 (D.C.Ga.1965))." (Italics added.)

■ Federal cases decided subsequent to 1968 clearly affirm the propriety of the telephone company's interception and disclosure of the evidence under the circumstances shown by the record in this case. A comprehensive statement of the entire matter appears in the decision of the district court in *United States* v. *Shah* (W.D.Pa. 1974) 371 F.Supp. 1170. The facts of that case are virtually indistinguishable from those in the case at bar. The telephone company suspected use of a blue box as the result of analysis of computer print outs. It installed equipment of the same kind employed by General Telephone on defendant's circuit. Like that employed by General Telephone, the recorder was activated by the employment of the 2,600 cycle tone and the recording was limited to the first minute of conversation. The tapes of the recording were turned over by the telephone company to the F.B.I. and were used to support an indictment of the subscriber for violation of the federal wire fraud statute. The court discussed the earlier authorities, noted that the Omnibus Act was merely intended to reflect existing law, and denied a motion to suppress. Affirming the reasonableness of the telephone company's monitoring and in distinguishing the situation in *Bubis* v. *United States, supra,* the court said: "Thus, it would appear that if the tape recordings of the defendant's conversations had been limited by the phone company to establishing that the calls were in violation of the subscription agreement and to the identification of the person using the phone and for those purposes *only,* then the tapes would have been admissible against the defendant. In the instant case, the Telephone Company's monitoring was so limited. The Company only monitored for seven days and the tapes were only of 60 second duration and were employed in an attempt to establish the identity of the caller, and no more; on one occasion Himanshu Shah was identified." (*United States* v. *Shah,* 371 F.Supp. at p. 1175.)

On this subject, the court further found (371 F.Supp. at p. 1176): "The Telephone Company had the right to turn over the tapes produced as a result of its authorized monitoring to the F.B.I. as a means of protecting its property and rights as a communications carrier as authorized under 18 U.S.C. § 2511 (2)(a)(i) and (ii)."

Another recent federal decision is that of the district court in *United States* v. *DeLeeuw* (E.D.Wis. 1974) 368 F.Supp. 426. This was a prosecution under the wire fraud statute for use of a blue box in which

information obtained by intercepting the defendant's phone calls through use of equipment substantially the same as that employed by General Telephone in this case was used to procure a search warrant. The same method of triggering the recorder for a period of approximately one minute by the sending of the 2,600 cycle signal was employed. Both the recording of the information and its disclosure to the prosecuting agency were found proper by the court which said (368 F.Supp. at p. 428): "I believe that the action taken by the telephone company security supervisor in attaching a 'blue box' detector to the defendant subscriber's line, which device recorded the numbers dialed, and conversations had on such line in only those instances where a 'blue box' frequency was actually applied thereto, constituted the type of nonrandom monitoring for the protection of property which is sanctioned by 18 U.S.C. § 2511(2)(a)(i). Accordingly, I conclude that there is no violation of 47 U.S.C. § 605 involved here and that the defendant's motion to suppress is without merit."

The fact that the telephone company reinstalled the recording mechanism for a second period of two days in May 1973 does not render inapplicable the above authorities. They affirm the propriety of the phone company's motive to protect its proprietary interest by furnishing usable information to prosecutorial agencies. The tapes which resulted from the monitoring in March 1973 would not, of course, have supported an application for a search warrant in May 1973. The second installation of the device, and the third attachment merely to verify the employment of the 2,600 cycle signal, was necessary to any effective use of the evidence of defendant's fraud. The subsequent attachments, like the original attachments, were " 'a necessary incident to . . . the protection of the rights or property of the carrier . . . .' " (368 F.Supp. at p. 427.)

It is, therefore, clear that the conduct of the telephone company in intercepting, recording and disclosing the matter communicated by means of defendant's telephone was not a violation of the Omnibus Act[4] and that its use in evidence was not thereby prohibited.

[4]Sections 630-637.2 of the California Penal Code also prohibit unauthorized connections with telephone wires. Section 631, subdivision (b), states an exception applicable to public utilities providing communication services and their agents where the acts otherwise prohibited "are for the purpose of construction, maintenance, conduct or operation of the services and facilities of such public utility." Though the language employed is different, it would appear that this section is consistent with the provisions of section 2511 of title 18 of the United States Code. As pointed out in *Hanna, supra,* 404 F.2d 405, the conduct of the phone company's business requires it to detect and prevent toll fraud. In any event, the federal statutes control the conditions under which the

## Defendant Has Not Been Subjected to
## an Unreasonable Search and Seizure

The conclusion that the interception, recording and disclosure of the data transmitted through defendant's telephone was not prohibited by the Omnibus Act does not dispose of this case. ■ Though the federal statutes have preempted the fields of wiretapping and electronic surveillance, their prohibitions against the use of evidence are in addition to those imposed by the search and seizure provisions of the Fourth Amendment to the Constitution of the United States and article I, section 13 of the California Constitution. Our Supreme Court said in *Halpin* v. *Superior Court, supra,* 6 Cal.3d at page 900: "Since we hold that title III has preempted particular fields of wiretapping and electronic surveillance, we need not reach the issue whether the Halpins' right of privacy was invaded by monitoring and tape recording the phone call. [Fn. omitted.]"

In *Halpin* the effect of the Omnibus Act was to prohibit receipt of the evidence. In this case, however, where the receipt of the evidence is not prohibited by said act, it is necessary to reach the issue as to whether defendant's right of privacy was invaded by the monitoring and disclosure of his phone calls.

■ Defendant contends that the principle stated in *Stapleton* v. *Superior Court,* 70 Cal.2d 97 [73 Cal.Rptr. 575, 447 P.2d 967], governs this case: that the People's use of the information obtained as a result of the wiretap with full knowledge of the manner in which it had been obtained, made the search a joint operation of the prosecutor and the phone company. As stated in *Stapleton* (70 Cal.2d at p. 103): "[T]he police need not have requested or directed the search in order to be guilty of 'standing idly by'; *knowledge of the illegal search* coupled with a failure to protect the petitioner's rights against such a search suffices." (Italics added.)

A comparable statement of the rule appears in *People* v. *Garber,* 275 Cal.App.2d 119 [80 Cal.Rptr. 214]. In a prosecution for toll fraud involving the use of a blue box, information produced by monitoring outgoing calls triggered by the 2,600 cycle tone was turned over to law enforcement representatives. A warrant was procured on the basis of this information and defendant's house was searched, disclosing incriminat-

interception of wire communications may be authorized. (*Halpin* v. *Superior Court,* 6 Cal.3d 885, 898 [101 Cal.Rptr. 375, 495 P.2d 1295].)

ing physical evidence. The court stated the rule with respect to private party searches (275 Cal.App.2d at pp. 126-127): "We note, moreover, that although evidence obtained in violation of the Fourth Amendment is inadmissible in state courts, the amendment does not apply to searches by a private individual unless such individual is wilfully participating in a joint activity with a state agent who either requests the *illegal search* or has knowledge of it but fails to protect the third party's rights. (*Stapleton* v. *Superior Court,* 70 Cal.2d 97, 100-101, 102 [73 Cal.Rptr. 575, 447 P.2d 967]; see *Burdeau* v. *McDowell* (1921) 256 U.S. 465 [65 L.Ed. 1048, 41 S.Ct. 574, 13 A.L.R. 1159]; *People* v. *Cahan,* 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513].) In the instant case the electronic eavesdropping was by the telephone company and there is no evidence of any government participation." (Italics added.) The court went on to find that there was no violation of law in the telephone company's activity and that the trial court had, therefore, properly denied a motion to suppress.

It is only when the search being conducted by the private party is illegal that passive involvement of the law enforcement agency which "fails to protect the third party's rights" renders the evidence inadmissible. Since we have held that there was nothing unlawful about the telephone company's search, the conduct of the prosecuting agency "standing idly by" is without legal significance.

A more difficult question is presented, however, by the general principle announced by the most recent decision of our Supreme Court in *Burrows* v. *Superior Court,* 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590]. In that case the court took a different approach to the matter of voluntary submission to a prosecutorial agency of information properly acquired by a private party. It held that records of defendant's bank transactions, which were voluntarily relinquished by the bank upon request of a detective investigating charges that defendant misappropriated funds of his client, "were acquired as the result of an illegal search and seizure (Cal. Const., art. I, § 13), and that the trial court should have granted the motion to suppress such documents." (13 Cal.3d at p. 245.) The court stated the general principle applicable as follows (13 Cal.3d at pp. 242-243): "Initially, we discuss the most significant and novel issue in this case: whether the police violated petitioner's rights under the California Constitution, article I, section 13,[2] in obtaining,

---

"[2]Article I, section 13, of the California Constitution provides, in part: 'The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated . . . .' "

without benefit of legal process, copies of statements from a bank in which he maintained an account. We have held, consonant with *Katz* v. *United States* (1967) 389 U.S. 347, 350-352 [19 L.Ed.2d 576, 581-582, 88 S.Ct. 507], that, in determining whether an illegal search has occurred under the provisions of our Constitution, the appropriate test is whether a person has exhibited a reasonable expectation of privacy and, if so, whether that expectation has been violated by unreasonable governmental intrusion. (*People* v. *Krivda* (1971) 5 Cal.3d 357, 364 [96 Cal.Rptr. 62, 486 P.2d 1262]; 8 Cal.3d 623-624 [105 Cal.Rptr. 521, 504 P.2d 457].)"

Applying this principle to the facts of the case, the court said (13 Cal.3d at p. 243): "[P]etitioner had a reasonable expectation that the bank would maintain the confidentiality of those papers which originated with him in check form and of the bank statements into which a record of those same checks had been transformed pursuant to internal bank practice." After concluding that the government could not justify a sweeping review of all bank records on the chance there might be evidence of illegal activity, the court continued (13 Cal.3d at pp. 244-245): "The People assert that no illegal search and seizure occurred here because the bank voluntarily provided the statements to the police, and the bank rather than the police conducted the search of its records for papers relating to petitioner's accounts. If, as we conclude above, petitioner has a reasonable expectation of privacy in the bank statements, the voluntary relinquishment of such records by the bank at the request of the police does not constitute a valid consent by this petitioner. Just as one may not validly consent to the search of the personal effects of another (*People* v. *Cruz* (1964) 61 Cal.2d 861, 866-867 [40 Cal.Rptr. 841, 395 P.2d 889]; *People* v. *Daniels* (1971) 16 Cal.App.3d 36, 42-45 [93 Cal.Rptr. 628]; *People* v. *Baker* (1970) 12 Cal.App.3d 826, 835-836 [96 Cal.Rptr. 760]), or to the entry and search of premises lawfully occupied by another (*Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1023]), so the fact that the bank voluntarily acceded to a police officer's request to deliver papers regarding petitioner's account cannot serve to validate the governmental conduct. It is not the right of privacy of the bank but of the petitioner which is at issue, and thus it would be untenable to conclude that the bank, a neutral entity with no significant interest in the matter, may validly consent to an invasion of its depositors' rights. *However, if the bank is not neutral, as for example where it is itself a victim of the defendant's suspected wrongdoing, the depositor's right of privacy will not prevail.*" (Italics added.)

The last sentence of the above quotation was added by modification of the opinion filed March 12, 1975. It is of utmost significance to the solution of the problem before this court. As modified, the decision acknowledges: (1) the propriety of a private party's voluntary disclosure of evidence of a crime of which it is the victim which it legitimately has in its possession, and (2) that the use of such evidence by the People does not violate the right of privacy. Under this standard the consent of the telephone company satisfied the requirements of article I, section 13 of the Constitution of California, for clearly the telephone company was the victim of the criminal conduct in question.

■ There remains the question whether there was a violation of defendant's right to be secure against unreasonable search and seizure, as provided by the Fourth Amendment to the Constitution of the United States. The answer to that question is equally clear.

For an unreasonable search and seizure to result from the interception of defendant's communication, he must have exhibited a reasonable expectation of privacy. Where, as here, one uses a communication facility illegally, no such expectation is exhibited.

The origin of this rule is *Sugden* v. *United States, supra,* 226 F.2d 281. In that case defendants used communication facilities illegally. (They made radio broadcasts while not licensed operators.) The defendants were held not entitled to suppress the content of any such broadcast. The court said (226 F.2d at p. 285): "Here in Sugden's case a special situation exists as to all of his and Mrs. Sugden's broadcasts save one day's. Although the station was licensed, the two Sugdens were not licensed operators until September 17th. Therefore, they were not legally using the station before September 17th. To throw a mantle of protection provided by Section 605 over an outlaw broadcast is to abandon reason. Therefore, we hold that as to private radio communications, before any right of privacy exists under Section 605 the voice must be legally on the air; otherwise one who hears, and especially the Federal Communications Commission, may make full disclosure. Giving the one who broadcasts without authority any protection under Section 605 could not tend to protect the means of communication." The decision in *Sugden* was affirmed by the Supreme Court in a terse per curiam opinion as follows: "The judgment is affirmed." (*Sugden* v. *United States, supra,* 351 U.S. 916 [100 L.Ed. 1449, 76 S.Ct. 709].)

In *Hanna* v. *United States, supra,* 404 F.2d 405, the Supreme Court's affirmance of the *Sugden* decision was noted and the court concluded that the user of a blue box had no right of privacy with respect to any communication made through the use of such device. Referring to its original decision, the court said (404 F.2d at p. 407): "As to the law, Judge Rives' original opinion was in error in not recognizing what Judge Hughes expressed so clearly in her dissenting opinion: 'The leading case which sustains the view that, if the use of a communication facility is illegal, the right of privacy does not exist and the matter may be divulged, is Sugden v. United States, 226 F.2d 281 (9th Cir.1955) affirmed per curiam, 351 U.S. 916, 76 S.Ct. 709 [100 L.Ed. 1449].' "

The opinion of the United States Supreme Court in *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], the seminal case holding wire communications to be protected by the Fourth Amendment, took cognizance of this history. In that case the court said (389 U.S. at p. 352 [19 L.Ed.2d at p. 582]): "The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been if he had remained outside. But what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen. No less than an individual in a business office,[10] in a friend's apartment,[11] or in a taxicab,[12] a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and *pays the toll that permits him to place a call* is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication." (Italics added.)

The Supreme Court's reference to the caller paying the toll that permitted him to make the call as being an element entitling him to assume that his words would not be broadcast was not inadvertent. The terse per curiam affirmance of *Sugden* clearly indicates this. Also indicative is the fact that shortly after *Katz* was decided this court, in *People* v. *Garber, supra,* 275 Cal.App.2d at page 128, said: "We are satisfied, moreover, that under the facts of this case there was no

"[10]*Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385.
"[11]*Jones* v. *United States,* 362 U. S. 257.
"[12]*Rios* v. *United States,* 364 U. S. 253."

violation of the statute on several grounds. We are particularly impressed by the holding in *United States* v. *Sugden,* 226 F.2d 281, 285 (affirmed per curiam, 351 U.S. 916 [100 L.Ed. 1449, 76 S.Ct. 709]), that where the use of a communication facility is illegal the right of privacy does not exist and the intercepted matter may be divulged. (See also *Hanna* v. *United States,* 404 F.2d 405, 407-408; *Brandon* v. *United States,* 382 F.2d 607, 611.) In *Hanna,* a case involving the subject statute, tape recordings divulged by a telephone company and gambling paraphernalia found as a result of such recordings were properly admissible against a defendant who had made illegal use of communication facilities and whose communications had been intercepted by the telephone company." (A petition for certiorari to the United States Supreme Court was denied (*sub nom. Teran, et al* v. *California,* 402 U.S. 981 [29 L.Ed.2d 146, 91 S.Ct. 1643]).)

It is thus clear that no right of privacy is violated by the interception, disclosure or use of communications illegally transmitted over interstate communication facilities. Defendant, therefore, had no reasonable expectation of privacy when he illegally entered the long distance network through use of the 2,600 cycle signal. No interception of any communications occurred except when he did use such signal. Consequently there has been no unreasonable search or seizure.

The judgment is affirmed.

Cobey, Acting P. J., and Allport, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 26, 1975.