# Authority of National Telecommunications and Information Administration to Monitor Radio Communications

The National Telecommunications and Information Administration (NTIA) may monitor radio communications to the extent reasonably necessary to discharge its functions under 47 U.S.C. § 305(a) and 15 U.S.C. § 272(12) & (13).

Title III of the Omnibus Crime Control and Safe Streets Act of 1963 prohibits NTIA from aurally monitoring communications between a radio and a land-line telephone.

February 12, 1980

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, DEPARTMENT OF COMMERCE

This responds to your request for our views on the authority of the National Telecommunications and Information Administration (NTIA) to monitor certain radio transmissions. You specify that NTIA will monitor these communications only to the extent necessary to perform its authorized functions, and that it will not divulge the contents or the existence of any particular intercepted message. Similarly, you say, NTIA will not attempt to decode coded messages.

For the reasons we state below, we believe that, with one exception, NTIA may conduct these monitoring activities to the extent they are reasonably necessary to discharge NTIA's statutory functions under 47 U.S.C. § 305(a) and 15 U.S.C. § 272(12) & (13). The one exception is that NTIA may not aurally monitor communications between a radio and a land-line telephone.

### I. NTIA Authority to Monitor Radio Communications

NTIA derives its authority from the Secretary of Commerce. No statute explicitly empowers the Secretary to monitor radio communications, but we believe that two statutes implicitly authorize the Secretary to monitor in certain situations. First, § 305(a) of the Communications Act of 1934, 47 U.S.C. § 305(a), provides that "[r]adio stations belonging to and operated by the United States . . . shall use such frequencies as shall be assigned . . . by the President." As you know, when the function of assigning frequencies to government stations was vested in the Office of Telecommunications Policy (OTP), *see* Reorganization Plan No. 1 of 1970, 84 Stat. 2083, we expressed the opinion that OTP was "implicitly authorized to conduct monitoring activities related to

its statutory responsibilities under § 305(a)." We reasoned that OTP's functions were analogous to those of the Federal Communications Commission, which assigns frequencies to radio stations not owned by the government and regulates certain aspects of their transmissions. *United States* v. *Sugden*, 226 F.2d 281, 284 (9th Cir. 1955), *aff'd per curiam*, 351 U.S. 916 (1956), held that the Commission can monitor radio communications in order to carry out its duty of assigning frequencies, because "[e]xcept by listening, how can the Commission tell with certainty that a station is using its assigned frequency?" *Id*. By analogy, we concluded, OTP was authorized to monitor radio transmissions in the course of performing its function of assigning frequencies to stations owned by the government. In 1977, this function was transferred to the Secretary of Commerce. Reorganization Plan No. 1 of 1977, as amended, § 5(B), 91 Stat. 1633. You tell us that the Secretary has delegated this responsibility to NTIA. Plainly, then, NTIA has the same authority as OTP had to monitor radio communications to the extent reasonably necessary to carry out its statutory responsibilities under § 305(a).

The second statutory source of NTIA's authority to monitor is 15 U.S.C. § 272(12) & (13). These subsections provide:

> The Secretary of Commerce . . . is authorized to undertake . . .
>
>     ＊     ＊     ＊     ＊     ＊
>
> (12) the investigation of the conditions which affect the transmission of radio waves from their source to a receiver;
> (13) the compilation and distribution of information on such transmission of radio waves as a basis for choice of frequencies to be used in radio operations.

You tell us that the Secretary of Commerce has also delegated these functions to NTIA. We believe that the reasoning of *Sugden* applies here as well; to the extent that the monitoring you describe is "reasonably ancillary to the effective performance of [these statutory] responsibilities," *United States* v. *Southwestern Cable Co.*, 392 U.S. 157, 178 (1968), we believe that NTIA is implicitly authorized to conduct it. *See, e.g., Permian Basin Area Rate Cases*, 390 U.S. 747, 777, 780 (1968).

Your letter appears to assume that Executive Order No. 12046 confers on NTIA additional authority to monitor radio communications. That executive order does not purport expressly to authorize the Secretary of Commerce to monitor. Your letter seems to suggest, however, that such authority is implicit in the executive order's instruction that the Secretary "serve as the President's principal adviser on telecommunications policies," § 2–401, conduct economic and technical analyses of telecommunications policies, § 2–412, represent the Executive

Branch in dealings with the Federal Communications Commission, § 2–407, and perform similar tasks. But as a general matter,[1] an executive order cannot enlarge the power of the Executive Branch beyond what Congress has granted. *See, e.g., Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 585 (1952). Therefore Executive Order No. 12046 does not expand NTIA's power to monitor beyond what can reasonably be inferred from 47 U.S.C. § 305(a) and 15 U.S.C. § 272(12) & (13).[2]

Partly because your letter assumed that Executive Order No. 12046 provides an independent source of authority to monitor, you did not make clear the extent to which NTIA needs to conduct the sorts of monitoring activities your letter describes in order to fulfill its statutory responsibilities. Thus we cannot specify which among the kinds of transmissions you mention in your letter may be monitored. In general, we believe that NTIA has authority to monitor both electrical impulses and voices on nongovernment frequencies; but it may monitor them only to the extent that such monitoring is reasonably necessary to enable NTIA to assign frequencies to government stations, and to perform the functions incident to assigning frequencies, or to investigate the conditions affecting the transmission of radio waves and to compile and distribute information about radio waves "as a basis for choice of frequencies to be used in radio operations." This authority is, of course, subject to the statutory restrictions to which we turn next.

## II. Statutory Limits on NTIA's Authority to Monitor

At first glance, two statutes appear to restrict NTIA's authority. Section 605 of the Communications Act of 1934, 47 U.S.C. § 605, provides, in relevant part, that "[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." The Department of Justice has consistently taken the position that since § 605 is phrased in the conjunctive—"intercept . . . *and* divulge" (emphasis added)—a government agency may intercept radio communications so long as it does not disclose information about them to any person outside the Govern-

---

[1] No inherent presidential powers, derived directly from the Constitution, appear to be involved in NTIA monitoring. *See generally United States* v. *United States District Court,* 407 U.S. 297, 308–12 (1972); Fleishman & Aufses, *Law and Orders: The Problem of Presidential Legislation,* 40 Law & Contemp. Probs., Summer 1976, at 1, 11–13. In any event, as we noted, Executive Order No. 12046 does not expressly attempt to authorize the Secretary of Commerce to monitor, and we are reluctant to assume that inherent executive powers have been invoked by implication.

[2] As you note, Executive Order No. 11556 assigned to OTP many functions similar to those assigned to the Secretary in Executive Order No. 12046, and § 5(B) of Reorganization Plan No. 1 of 1977 transferred "[a]ll . . . functions of the Office of Telecommunications Policy and of its Director," with exceptions not relevant here, to the Secretary of Commerce. But for the reasons we have given, Executive Order No. 11556 could not have expanded OTP's powers beyond what was granted by statute, and in any event a reorganization "may not have the effect of . . . authorizing an agency to exercise a function which is not expressly authorized by law at the time the plan is transmitted to Congress." 5 U.S.C. § 905(a)(4). Thus Reorganization Plan No. 1 of 1977 does not give NTIA any additional statutory authority.

ment. *See* Office of Legal Counsel Memorandum for the Director, Federal Bureau of Investigation, May 29, 1979, 3 Op. O.L.C. 240, 245 (1979) (hereinafter "1979 OLC Memorandum") H.R. Rep. No. 1283, Pt. 1, 95th Cong., 2d Sess. 15 (1978). *See also United States* v. *Butenko*, 494 F.2d 593, 623-24 (3rd Cir.) (Aldisert, J., concurring and dissenting), *cert. denied*, 419 U.S. 881 (1974). Moreover, as the language of § 605 suggests, only divulging the contents or existence of a particular "communication" is prohibited. In our view, NTIA would not violate § 605 if, after monitoring, it divulged only aggregate statistics about the use of radio frequencies. You stipulate that you will not reveal the contents of communications to any other party; so long as "contents" is understood broadly to include the "existence" and "purport, effect, or meaning" of the particular communication, we believe that NTIA's monitoring will not run afoul of 47 U.S.C. § 605.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2520, presents a more complex question. It provides that with certain exceptions, "any person who . . . willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 2511(1)(a). A "wire communication" is defined as:

> any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications.

18 U.S.C. § 2510(1). An oral communication is defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). Radios contain wires, but the wires are not "connection[s] between the point of origin and the point of reception furnished or operated by . . . a common carrier." For this reason, we have previously expressed the view that communications between two radios are not "wire communications" within the meaning of Title III. 1979 OLC Memorandum, 3 Op. O.L.C. at 242. The Ninth Circuit has reached the same conclusion. *United States* v. *Hall*, 488 F.2d 193, 196-97 (9th Cir. 1973).

On the basis of the legislative history of Title III, *see e.g.,* S. Rep. No. 1097, 90th Cong., 2d Sess. 66, 75, 89-90 (1968); *see also United States* v. *Hall,* 488 F.2d at 198, we have previously concluded, 1979 OLC Memorandum, 3 Op. O.L.C. at 242 & n.2, that when Congress limited the definition of "oral communication" to communications by a person

who has "an expectation that such communication is not subject to interception under circumstances justifying such expectation," it intended to include only those communications made with a "reasonable expectation of privacy" in the sense in which that term is used in defining a "search" under the Fourth Amendment, *see, e.g., Katz* v. *United States.* 389 U.S. 347, 351–53 (1967). *See also United States* v. *United States District Court,* 407 U.S. 297, 302 (1972). 1979 OLC Memorandum, 3 Op. O.L.C. at 242 & n.2. We have also previously concluded that radio users have no reasonable expectation of privacy in ordinary radio transmissions. We reasoned that the "ease of interception, the widespread availability of the technology required for interception, and the ease of access for the user to more private means of communication" all suggested that one cannot reasonably expect ordinary radio communications to remain private. *Id.* at 243.[3]

It follows from these conclusions we have previously reached that ordinary communications by radio are not "oral communications" within the meaning of Title III.[4] As we have said, communications between radios are also not "wire communications." Thus Title III, like § 605, does not prohibit NTIA from intercepting ordinary communications between radios. We know of no other statute that applies.

Title III does, however, prohibit NTIA from monitoring communications between a party using a mobile telephone or other radio and a party using a land-line telephone. "Wire communication" is defined by Title III as "any communication made *in whole or in part* . . . by the aid of" wire or cable facilities furnished or operated by a common carrier. 18 U.S.C. § 2510(1) (emphasis added). In the legislative history, Congress noted that this definition is intended to be "comprehensive." S. Rep. No. 1097, 90th Cong., 2d Sess. 89 (1968). Otherwise, the legislative history seems to give no indication of how Congress wished to treat communications between a radio telephone and a land-line telephone. In these circumstances, we must follow the language of the statutory definition; since communications betweeen a radio telephone and a land-line telephone are made "in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection . . . furnished or operated by . . . a common carrier," we must conclude that they are "wire communications" under Title III. The Ninth Circuit, apparently the only court to have considered the issue, reached the same conclusion. *United States* v. *Hall,* 488 F.2d at 197–98. Title III prohibits "any person" from "intercept[ing]" wire communications without a warrant; it contains some exceptions,

---

[3] As the quoted language suggests, we assume that NTIA proposes to intercept only ordinary radio transmissions, not transmissions made by sophisticated means designed to prevent the transmission from being intercepted by devices that are generally known to exist.

[4] Since radio users have no reasonable expectation of privacy in ordinary radio transmissions, intercepting such transmissions would not violate the Fourth Amendment.

but none applies to NTIA.[5] As you know, we have previously said that monitoring electrical impulses alone—without translating them to voice impulses—does not violate Title III. Therefore Title III does not prohibit NTIA from monitoring the electronic impulses of communications between radios and land-line telephones. But NTIA may not aurally monitor a transmission if any party to the transmission is using a land-line telephone. With this restriction, we believe that NTIA is authorized to monitor radio communications in the categories you identify in your letter, when such monitoring is reasonably necessary if NTIA is to perform its functions under 47 U.S.C. § 305(a) and 15 U.S.C. § 272(12) & (13).

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[5] The statute partially exempts "an officer. employee. or agent of the Federal Communications Commission, in the normal course of his employment and in discharge of the monitoring responsibilities exercised by the Commission" from these prohibitions. 18 U.S.C. § 2511(2)(b). As you know, we previously concluded that this exemption did not embrace employees of NTIA's predecessor, OTP. We reasoned that when Congress enacted the Omnibus Crime Control Act, it was aware that certain agencies had responsibility for government communications corresponding to the Federal Communications Commission's responsibilities for private communications; yet Congress exempted only the Commission from Title III. We noted that the case law confirmed this view. *See. e.g., United States* v. *Sugden,* 226 F.2d 281, 285 (9th Cir. 1955), *aff'd per curiam,* 351 U.S. 916 (1956). For these same reasons, NTIA is not exempted from the restrictions contained in Title III. No other exemptions are relevant.