James RESTON, Jr., Plaintiff,

v.

FEDERAL COMMUNICATIONS COMMISSION, Defendant.

Civ. A. No. 79–2476.

United States District Court, District of Columbia.

May 30, 1980.

Pamela Horowitz, Washington, D. C., Denise B. Leary, Chapel Hill, N. C., for plaintiff.

Marta W. Berkley, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Instituted in September 1979 under the Freedom of Information Act (FOIA), as amended, 5 U.S.C. § 552, the focus of this litigation is certain records, in the form of tape recordings of amateur radio transmissions, in the possession of defendant Federal Communications Commission (FCC) that had been denied to plaintiff by the Commission in a memorandum opinion and order adopted and released in July 1979. Plaintiff James Reston, Jr., having filed his final submission in April 1980, disposition of this action, pending on cross-motions for summary judgment, is now appropriate. After careful consideration of the various filings, the Court has determined that there are no material facts in dispute, making summary judgment proper, and that defendant's motion should be granted and judgment entered in its favor and against plaintiff.

While carrying out its enforcement responsibilities with regard to amateur radio station operations, the Commission's routine monitoring of amateur frequencies revealed certain ongoing violations of FCC rules by members of the now well-known People's Temple religious organization transmitting between amateur radio stations WD 6 DVI and WA 6 DTJ in San Francisco, California, and amateur radio stations WB6MID portable 8R3 and WB6MWH/8R1 in Jonestown and Georgetown, Guyana, South America. Ultimately, notices of FCC rule violations were sent to two licensed amateur operators associated with the People's Temple in California in May 1977 and in March, April, May, and October 1978, and fines were assessed.

In the course of its investigation of the People's Temple stations, the FCC recorded a number of radio transmissions between the California and Guyana stations, amassing twenty-five tape cassettes and four reels of tape. Also in the possession of the Commission, and at issue in this action, is one tape cassette, which is alleged to be a recording of transmissions by persons involved with the People's Temple, that was made by an amateur radio operator and submitted to the FCC in July 1978 as evidence to support his complaints about rule violations by the People's Temple stations. Prior to plaintiff's FOIA request, the only release of the tapes by the Commission was made under subpoena to a federal grand jury in California, which was investigating the events in Jonestown, Guyana, that resulted in the tragic death of United States Congressman Leo Ryan and others, and to the Committee on International Relations of the United States House of Representatives.

Desiring to hear these tapes to gather resource material for a forthcoming book on the Reverend Jim Jones and the People's Temple organization of which Jones was the founder, in January 1979 plaintiff Reston submitted an informal inquiry to FCC General Counsel Robert Bruce asking for the release of all materials held by the Commission regarding the People's Temple radio transmissions. This informal request was denied and on March 28, 1980, a formal FOIA request was submitted to the Commission.

In an opinion released July 18, 1979, the Commission denied plaintiff's request in part and granted it in part. *In re Reston*, 72 F.C.C.2d 662 (1979). With regard to the tape recordings, the Commission found alternative bases for denying plaintiff's FOIA request. Citing section 552(b)(3), which exempts from disclosure those records whose revelation is specifically barred by another statute, the Commission found that Congress expressed its intention in section 605 of the Communications Act of 1934, as amended, 47 U.S.C. § 605, that amateur broadcasts, such as those involved, that were not intended for use by the general public were not to be disclosed. *Id.* at 665–69. Alternatively, the Commission stated, disclosure was barred by section

552(b)(7)(A) because the tape recordings were, within the meaning of that provision, investigatory records compiled for law enforcement purposes whose disclosure would interfere with the ongoing law enforcement proceedings of the California grand jury. *Id.* at 669–70. Further, responding fully to plaintiff's request for all materials relating to the radio transmissions, the Commission revealed that there were eight other documents fitting that description of which only two would be withheld, those being internal legal memoranda exempt from disclosure under section 552(b)(5). *Id.* at 670–71. While plaintiff's complaint in this action refers to the release of all records relating to the People's Temple radio transmissions, it is apparent from the filings that his only interest is in the tape recordings and thus the Commission's invocation of section 552(b)(5) to exempt the two legal memoranda from disclosure, not being specifically addressed by plaintiff, is deemed to have been conceded as proper.

■ Turning then to the question of the propriety of the Commission's refusal to release the tape recordings at issue, we begin with the well-established proposition that because the general philosophy of the Freedom of Information Act is one of full disclosure absent some clearly delineated exemption in the Act, the agency here must bear the burden of showing that the recordings are exempt. *See, e. g., Federal Open Market Committee of the Federal Reserve System v. Merrill*, 443 U.S. 340, 351–52, 99 S.Ct. 2800, 2808–09, 61 L.Ed.2d 587 (1979); *Chrysler Corp. v. Brown*, 441 U.S. 281, 290 & n. 10, 99 S.Ct. 1705, 1712 & n. 10, 60 L.Ed.2d 208 (1979). In its efforts to fulfill this burden, the Commission once again

proffers alternative grounds to justify non-disclosure. While choosing to abandon its original reliance upon exemption (7)(A) of section 552(b) because in December 1979 the grand jury investigation in California was concluded and its members dismissed, the Commission nonetheless continues to rely on exemption (3) in section 552(b). In this regard, it refers to two statutory provisions it contends exempt the tapes from disclosure: section 605 of title 47, upon which it relied in its July 1979 decision, and Rule 6(e) of the Federal Rules of Criminal Procedure. In considering these two statutory provisions, because the Court has determined that section 605 is indeed a bar to the disclosure of the tapes of People's Temple transmissions, it need not and will not reach the question of whether Rule 6(e) would likewise preclude their release.[1]

Subsection (3) of section 552(b), the exemption upon which the Commission relies, states that the disclosure provisions of section 552 do not apply to matters that are "specifically exempted from disclosure by statute . . ., provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." As was made clear by the United States Court of Appeals for the District of Columbia Circuit in *American Jewish Congress v. Kreps*, 187 U.S.App.D.C. 413, 415, 574 F.2d 624, 626 (1978), any agency attempt to invoke this exemption raises the initial issue whether the statute in question, in this instance section 605, fulfills the requirements of either subsection (A) or (B) of section 552(b)(3).

---

1. Rule 6(e) of the Federal Rules of Criminal Procedure provides in pertinent part:

 A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph 3(A)(ii) of this subdivision [, which relates to disclosures to government personnel deemed necessary to assist a government attorney in his duty to enforce federal criminal law,] shall not disclose matters occurring before the grand jury, except as otherwise provided

 for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.

 Fed.R.Crim.P. 6(e)(2). Rule 6(e) has been judicially recognized as a statute falling within the exemption of subsection (b)(3) of section 552. *See Stassi v. United States Dep't of Justice*, Civ. No. 78–0536, slip op. at 5 (D.D.C. Apr. 12, 1979); *Hiss v. Department of Justice*, 441 F.Supp. 69, 70 (S.D.N.Y.1977).

As set out in title 47 of the United States Code, section 605 provides:

Except as authorized by chapter 119, Title 18 [, the provisions regulating the interception of wire and oral communications,] no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communications by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress.

47 U.S.C. § 605 (1976). It is apparent from the terms of section 605 that while it cannot fall within subsection (A) in that it fails to leave "no discretion on the issue [of disclosure]," it is a candidate under subsection (B) as it establishes "particular criteria for withholding or refers to particular types of matters to be withheld." In determining whether a given statute fulfills this criteria, the court in *American Jewish Congress*, after examining certain statutes that Congress had indicated in the legislative history of subsection (B) would or would not meet its requirements, declared that "[t]hese and other examples imply a congressional sense that the crucial distinction lay between statutes that in some manner *told* the official what to do about disclosure and those that did not significantly inform his discretion in this regard." 187 U.S.App.D.C. at 418, 574 F.2d at 629 (emphasis in original). This provision does indeed meet these criteria. While the second sentence of section 605 is quite specific in that "[n]o person not being authorized by the sender shall intercept any radio communication and divulge . . . [the] contents . . . to any person," nonetheless that provision also sets forth with particularity those communications subject to disclosure, that is, those "broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress." It is evident that in this provision, the strictures of which the Commission cannot waive, *see United States v. Sugden*, 226 F.2d 281, 285 (9th Cir. 1955), *aff'd per curiam*, 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449 (1956), Congress has indeed adequately informed agency officials about what to do regarding disclosure and, as a result, section 605 qualifies as a statute by whose terms the Commission may claim, under section 552(b)(3)(B), an exemption from the general requirement of disclosure under section 552.

 Having so concluded, the next question that arises is to what extent sec-

tion 605 demands the disclosure or nondisclosure of the taped communications in question here. That provision states that "no person . . . shall intercept any radio communication and divulge [it]," a requirement that applies not only to any "individual, partnership, association, joint-stock company, trust, or corporation," 47 U.S.C. § 153, but also to the Commission except to the extent such interception or disclosure is necessary to aid the Commission in fulfilling its responsibility to enforce the provisions of the Communications Act. *United States v. Sugden, supra,* 226 F.2d at 285; *see* 18 U.S.C. § 2511(2)(b).[2] The disclosure requested in this instance having nothing to do with the enforcement of those laws regulating radio communications, a further provision must be found elsewhere within section 605 that would allow the

disclosure plaintiff seeks. To this end, the final sentence of section 605 becomes the object of scrutiny for it declares that "[t]his section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress." More specifically, the parties focus on the phrase "amateurs or others for the use of the general public," plaintiff arguing that this language exempts all amateur transmissions from section 605's prohibition on interception and disclosure, while defendant asserts that it applies only to those amateur transmissions intended for the use of the general public, which those in question here were not.[3] It is this question of statutory con-

---

**2.** Seeking to counter defendant's assertion that section 605 is a statute coming within section 552(b)(3), plaintiff also argues that section 2511(2)(b) of title 18 expressly authorizes the Commission to disclose the records at issue here. That section provides:

It shall not be unlawful under this chapter for an officer, employee, or agent of the Federal Communications Commission, in the normal course of his employment and in discharge of the monitoring responsibilities exercised by the Commission in the enforcement of chapter 5 of title 47 of the United States Code, to intercept a wire communication, or oral communication transmitted by radio, or to disclose or use the information thereby obtained.

18 U.S.C. § 2511(2)(b) (1976). In so contending, plaintiff would have the Court interpret this section to equate a disclosure pursuant to a Freedom of Information request with those disclosures in the normal course of Commission employment permitted by section 2511(2)(b). It is apparent, however, that, in light of the stringent restrictions on the interception and disclosure of wire and oral communications imposed by the provisions of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–2520, of which section 2511(2)(b) is a part, section 2511(2)(b)'s purpose was only to authorize the Commission's employees to intercept and disclose communications in the course of performing their administrative and enforcement responsibilities in connection with the Communications Act of 1934, as amended, 47 U.S.C. §§ 151–609, and not to subject all such interceptions to public scrutiny.

**3.** In its opinion, the Commission declared the taped transmissions to be of a personal nature

and thus not subject to disclosure under section 605 as being "for the use of the general public," *In re Reston,* 72 F.C.C.2d 658, 668 (1979), and in this action has filed in support of its motion for summary judgment the affidavit of FCC attorney James Keats in which he states at paragraph 10 that "[t]he transmissions of the People's Temple were point-to-point transmissions and not intended for the general public. They were, therefore, protected by Section 605. (*Order* [of the Commission], paragraph 12 [, 72 F.C.C.2d at 668].)" Plaintiff has filed a motion to strike this portion of the affidavit of Mr. Keats claiming it fails to comport with the requirements of Federal Rule of Civil Procedure 56(e) in that it is not made on personal knowledge, but is the product of hearsay.

It is true that the agency bears the burden of justifying its refusal to permit disclosure and must do so by detailed affidavits or oral testimony sufficient to enable the trial court to make its own independent assessment of the agency's claims. *Harvey's Wagon Wheel, Inc. v. NLRB,* 550 F.2d 1139, 1141–42 (9th Cir. 1976). In this instance, however, that justification was supplied by the agency itself in its opinion, which most certainly could be relied upon by an employee in his affidavit, and appears sufficient to support defendant's motion for summary judgment in light of the plaintiff's failure to challenge seriously the Commission's determination that the transmissions in question were not for the use of the general public by even making a request, pursuant to *Vaughn v. Rosen I,* 157 U.S.App.D.C. 340, 484 F.2d 820 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), for an index. Accordingly, plaintiff's motion to strike will be denied.

struction with which the Court is confronted.

Consideration of the words of a statute is, of course, the initial step in any endeavor at statutory interpretation. *See, e. g., Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); *American Trucking Associations v. United States,* 195 U.S.App.D.C. 266, 271–72, 602 F.2d 444, 449–50, *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). In this regard, as support for its conclusion the Commission found the grammatical structure of the sentence and phrase in question compelling, observing:

> It is crucial to note that the phrase "or related to ships in distress" is set off by a comma from the phrase "broadcast or transmitted by amateurs or others for the use of the general public." Since no comma precedes the word "others", it is apparent that Congress intended the phrase "for the use of the general public" to modify "amateurs" as well as "others."

*In re Reston, supra,* 72 F.C.C.2d at 666–67. Certainly, such an interpretation appears to be consistent with the congressional use of the term "broadcast" in conjunction with the phrase "transmitted by amateurs or others for the use of the general public." While broadcasting, which is statutorily defined as "the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations," 47 U.S.C. § 153(*o*) (1976), is prohibited for amateurs, 47 C.F.R. § 97.113 (1979), as inconsistent with their statutorily defined role as "duly authorized person[s] interested in radio technique solely with a personal aim and without pecuniary interest," 47 U.S.C. § 153(q) (1976); 47 C.F.R. § 97.3(b) (1979); *cf.* Radio Regulations, Dec. 21, 1959, art. 41, § 2(1), 12 U.S.T. 2377, T.I.A.S. No. 4893, thereby limiting their transmissions almost solely to personal point-to-point transmissions, nonetheless an amateur is permitted in certain emergency situations to "broadcast" a general call to all stations, referred to as a CQ transmission, which is intended to be received and used by anyone, *see* 47 C.F.R. § 97.107 (1979). Recognizing this distinction between types of amateur transmissions supported its interpretation of the statutory language in question, the Commission declared:

> A primary tenet of statutory construction is that statutory language should be given its ordinary common sense effect. Simply reading the sentence here in issue makes it clear that in addition to broadcasts, there are three types of radio transmissions which are excluded from 605 protection: amateur transmissions for general public use, other transmissions for general public use, and transmissions relating to ships in distress. Congress rationally carved out certain categories of radio transmissions where no privacy was intended or expected. Clearly, broadcasts, such as AM or FM radio are meant to be heard by anyone listening and the content may be divulged. Messages regarding ships in distress are meant to be divulged if they are to be of any use. In this vein, it would clearly be illogical to apply the Section 605 proscriptions to amateur radio transmissions which are intended for use by the public, and equally as illogical not to apply the Section 605 proscriptions to amateur transmissions which are of a personal nature and not intended for use by the general public. Thus, the phrase "for use of the general public" must be read to modify the word "amateurs" as well as the word "others."

*In re Reston, supra,* 72 F.C.C.2d at 666 (footnote omitted).

Plaintiff, on the other hand, calling upon the rule of statutory interpretation that all words used in a statute should be given full effect, *see, e. g., Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 135, 479 F.2d 842, 856 (en banc), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *United States v. Herbert Bryant, Inc.,* 386 F.Supp. 1287, 1292 (D.D.C.1974), argues that to accept defendant's interpretation would excise the word "amateurs" from the statute since Congress could have obtained the same result by simply declaring that all transmissions for the use of the general

public were to be subject to disclosure. Defendant counters this assertion by categorizing the use of "amateurs or others" as a congressional attempt to provide an example of the types of transmissions exempted from section 605 as well as a congressional recognition of the special, dual nature of amateur transmissions in that they can be either private (point-to-point) or public (CQ). Further, the defendant asserts that to accept plaintiff's interpretation would result in ascribing a degree of illogic to congressional drafting since the degree of exemption allowed by that section would vary from total with "amateur," to partial for "others," and back to total for "ships in distress."

After considered examination of the language of section 605 and the contentions of the parties, the Court is unable to say that on its face the meaning of the statutory phrase in question is so apparent as to preclude the need for additional inquiry. The defendant's arguments concerning grammar, syntax, and the proper common sense interpretation of the statute are persuasive, but still not sufficient to foreclose the desirability of further inquiry.

The most obvious, and as a consequence most often the initial tool relied upon in the construction of a statute whose meaning is not readily apparent from its language, is the legislative history of the provision in question. In this instance, the full use of that instrument of interpretation requires that the Court look back nearly seventy years, to a time when federal regulation of the airwaves was in its nascent stage.

Congress' first legislative extension of the requirements of licensing under federal law to amateurs and its initial imposition of a ban on the disclosure of radio transmissions are found in the Act of August 13, 1912, Pub.L.No.264, ch. 287, §§ 1, 4, 37 Stat. 302, also referred to as the Radio Act of 1912. Its nondisclosure provision, found in regulation 19 of the act, provided in pertinent part:

> No person or persons engaged in or having knowledge of the operation of any station or stations, shall divulge or publish the contents of any messages transmitted or received by such station, except to the person or persons to whom the same may be directed, or their authorized agent, or to another station employed to forward such message to its destination, unless legally required to do so by the court of competent jurisdiction or other competent authority.

Act of August 13, 1912, Pub.L.No.264, ch. 287, § 4, 37 Stat. 307. Making reference to legislative committee reports regarding the act, each of the parties contends that this provision did, or did not as the case may be, evidence an initial and ultimately unswerving congressional intent to exempt amateurs from any ban on the disclosure of radio transmissions.

In its report on H.R.15357, a proposal that was largely similar to S. 6412 that was enacted into law as the 1912 act, in referring to that bill's version of regulation 19 that provided "[e]very operator shall be obligated to preserve, and shall preserve faithfully, the secrecy of radiograms which he may receive or transmit," H.R.15357, 62d Cong., 2d Sess. § 4, reg. 19 (1912), *reprinted in* H.R.Rep.No.582, 62d Cong., 2d Sess. 5 (1912), the House Committee on the Merchant Marine and Fisheries noted that this provision was "required by the Berlin convention and has been urged by commercial concerns at hearings before committees of Congress." H.R.Rep.No.582, 62d Cong., 2d Sess. 16 (1912). Because the Berlin Convention referred to by the committee did not apply to amateur broadcasting, Wireless Telegraph Convention of Berlin, Nov. 3, 1906, art. 1, 37 Stat. 1565 (1912), and because this provision was urged by commercial broadcasters, plaintiff contends, the congressional intent clearly was that any regulation on nondisclosure not apply to noncommercial operators. This assertion is severely undercut, however, by the declaration of the House committee that all the regulations, with certain exemptions not including the nondisclosure provision in the bill in question, were to apply to amateurs. H.R.Rep.No.582, *supra* at 10. Faring no better is plaintiff's additional evidence of

congressional desire to exclude amateurs, which he finds in the statement in the report of the Senate's Committee on Commerce that "the bill [, S. 6412,] does not interfere in any way with the hearing of messages by amateurs at all times and places as they may elect." S.Rep.No.698, 62d Cong., 2d Sess. 4 (1912). This statement is in complete harmony with the language of the act, which precludes not the hearing, but the unauthorized divulgence or publication of radio transmissions, while in no way qualifying regulation 19's applicability to all "persons," including amateurs.[4] Consequently, plaintiff's assertion that the 1912 act indicates the early congressional preference for the exemption of amateur transmissions from any nondisclosure is gravely in doubt.

Of course, even if the Act of 1912 did prohibit the disclosure of the content of amateur transmissions, that exemption could have been altered by Congress in later legislation and, as such, section 605's other predecessors are of obvious importance. In its own search of the legislative history, the Court finds the initial appearance, apparently in 1924, of a disclosure provision similar to that of the current section 605. In that year a bill was introduced in the House of Representatives, section 12 of which provided for the confidentiality of radio transmissions in terms resembling those of the present section 605 with the caveat that "this section shall not apply to the receiving, divulging, publishing, or utilizing of the contents of any radio conversation transmitted for the use of the general public or relating to ships in distress." H.R. 7357, 68th Cong., 1st Sess. § 12 (1924), *reprinted in Hearings Before the Comm. on the Merchant Marine and Fisheries on H.R. 7357 to Regulate Radio Communication,* 68th Cong., 1st Sess. 6 (1924). In midMarch 1924 at the committee hearing concerning the bill, the only representative of amateur radio interests made the following comments concerning section 12:

Section 12, page 19, lines 16, 17, and 18, although apparently not designed to affect the amateur, nevertheless, applies to him as it now reads, in a manner I have no doubt was not contemplated when it was written. Suppose a west coast amateur received a vital message from the McMillan arctic expedition addressed to a party on this coast, and conditions made it desirable to forward the message via the Western Union to expedite its delivery; under this section the amateur would first have to wire the addressee and obtain his permission to forward the message, even though addressed to him, or to go back to the McMillan expedition by radio and get the permission of the sender. This seems an unnecessary and uncontemplated hardship, and we believe some exception should be made here on behalf of amateur traffic.

*Hearings Before the Comm. on the Merchant Marine and Fisheries on H.R.7357 to Regulate Radio Communication,* 68th Cong., 1st Sess. 100 (1924) (remarks of B. K. Warner). None of the members of the committee expressed their approval or disapproval of this interpretation and criticism of section 12 and the bill itself was never reported out of committee. Two months later, however, a report was issued by that same committee on a different bill, S. 2930, 68th Cong., 1st Sess. (1924), prepared after the hearings on H.R.7357, and in its comments on that Senate bill's confidentiality provision, section 16, the committee declared: "It is provided that the section shall not apply to the receiving or utilizing the contents of radio communications transmitted by amateurs or others for the use of the general public or relating to ships in dis-

---

4. In arguing against defendant's interpretation of section 605, plaintiff has asserted that to make the statute applicable to amateurs' point-to-point conversations would render criminal what he contends is the common amateur practice of listening to the conversations of other amateurs. Such a reading of this provision, however, would ignore its plain language, which requires not only that there be an interception of a transmission, but also the divulgence, publishing, or use of the contents of that transmission in order for a violation of section 605 to occur. *See Bufalino v. Michigan Bell Tel. Co.,* 404 F.2d 1023, 1027 (6th Cir. 1968), *cert. denied,* 394 U.S. 987, 89 S.Ct. 1468, 22 L.Ed.2d 763 (1969).

tress." H.R.Rep.No.719, 68th Cong., 1st Sess. 7 (1924). While this bill also was not enacted, the same language suggested in this report was used in a 1925 bill, H.R.5589, 69th Cong., 1st Sess. § 14 (1925), *reprinted in Hearings Before the Comm. on the Merchant Marine and Fisheries on H.R.5589 to Regulate Radio Communications*, 69th Cong., 1st Sess. 8 (1926), and at hearings concerning its provisions a representative of amateur radio found no fault with them. *Hearings Before the House Comm. on the Merchant Marine and Fisheries on H.R.5589 to Regulate Radio Communications*, 69th Cong., 1st Sess. 125–26 (1926) (remarks of Charles H. Stewart). Ultimately, this same language was adopted as part of the Radio Act of 1927, the 1912 act's statutory successor, which declared in section 27, its confidentiality provision, that "[t]his section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcasted or transmitted by amateurs or others for the use of the general public or relating to ships in distress." Radio Act of 1927, Pub.L.No.632, ch. 169, § 27, 44 Stat. 1162. In the House and Senate committee reports on that legislation, the only reference to that provision is in the House report that states "[t]he section is a redraft of a provision of existing law." H.R.Rep.No.404, 69th Cong., 1st Sess. 4 (1926). Further, during debate on the passage of the 1927 act, Senator Pittman, in opposing certain portions of a conference report on the legislation, declared:

Section 27 of the conference bill provides that—. . . no person not being authorized by the sender shall intercept any message and divulge or publish the contents, substance, purport, effect or meaning of such intercepted message to any person; . . .

This language does not limit such message to one of a private or personal nature and therefore must apply to all messages. The language in its uncertainty is dangerous. It might be construed to prohibit the interception and publication of a speech by the Premier of England sent by the broadcasting corporation of England to the Radio Corporation of America. It might be construed to prevent the interception and publication of a speech by the President of the United States sent by one radio corporation to another radio corporation.

69 Cong.Rec. 4109 (1927). Subsequent to Senator Pittman's remarks, the conference bill was adopted without further amendment and became the Radio Act of 1927.

While the legislative history of the 1927 act and the unenacted bills preceding it give some indication of the sequence of events that resulted in the introduction of the phrase "amateurs or others for the use of the general public" into communications legislation, it does little to clarify the exact meaning of that expression. The total absence of any expressed understanding of or agreement with the testimony of the amateur representative as it concerned the applicability of section 12 of H.R.7357 to amateurs either at the 1924 hearing or in the later House Report No. 719 on the revised bill makes it impossible to discern whether the committee, by the addition of the phrase "amateurs or others for the use of the general public," intended it to have the meaning attributed to it here by the plaintiff or by the defendant. Accordingly, that testimony is of negligible, if any, use in answering the constructional question confronting the Court. *See, e. g., Austasia Intermodel Lines, Ltd. v. Federal Maritime Commission*, 188 U.S.App.D.C. 379, 382, 580 F.2d 642, 645 (1978); *March v. United States*, 165 U.S.App.D.C. 267, 275 & n. 30, 506 F.2d 1306, 1314 & n. 30 (1974). *See generally* 2A C. Sands, *Sutherland Statutory Construction* § 48.10, at 210 & nn. 11–14 (4th ed. 1973). The same is true of those portions of the legislative history concerning the adoption of the phrase as part of the Radio Act of 1927. In light of the apparent application of the 1912 Act's confidentiality provision to amateurs, *see* p. 704 *supra*, the comments of the House committee in House Report No. 404 appear, if anything, to support the interpretation of the defendant, while the reference to the provision by Senator Pittman does not, contrary to plaintiff's assertions, indicate that

it was only to apply to commercial concerns, but merely appears to be his use of one example of a situation to which he thought section 605 might apply without explanation as to his understanding of the meaning of section 27's proviso concerning amateur transmissions. Perhaps the only cognizable indicia of congressional intent regarding the 1927 enactment is the language of section 27 itself which, unlike the later provisions enacted in 1934 and 1968, *see* p. 706 *infra,* does not contain the punctuation that defendant argues indicates an intent to group "amateurs" with "others for the use of the general public," *see* p. 702 *supra.* Such an interpretation, however, would not answer defendant's contention regarding the illogic of a reading that places a partial exemption between the total exemptions. *See* pp. 702–703 *supra.* Moreover, as has been pointed out previously, whatever interpretation Congress may have intended that the phrase have in 1927, it cannot control the meaning of the subsequently enacted and revised section 605 without some indication that such was the will of Congress.

In 1934, the Congress again found the need to reform the then-existing communications legislation and enacted the Communications Act of 1934, Pub.L.No.416, ch. 652, 48 Stat. 1064. Its confidentiality provision, found in section 605, *id.* 48 Stat. 1103–04, was declared by the reports of the Senate and House committees concerned to be "based upon section 27 of the Radio Act [of 1927]." H.R.Rep.No.1850, 73d Cong., 2d Sess. 9 (1934); S.Rep.No.781, 73d Cong., 2d Sess. 11 (1934). The language of section 605 was not identical to that of section 27, however, for its prohibition on the receiving and divulgence or use of radio transmissions was not to apply to "the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress." This language remained in force until 1968 when, as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No.90–351, sec. 803, 47 U.S.C.A. § 605, 82 Stat. 197, the Congress

substituted, as opposed to reenacted, S.Rep. No.1097, 90th Cong., 2d Sess. 107, *reprinted in* [1968] U.S.Code Cong. & Ad.News, pp. 2112, 2196, section 605 in its present form. As described in the Senate committee report, the substituted section 605's ban on disclosure was "not intended to apply to radio broadcasts or transmission by amateurs or others for the use of the general public or which relates to ships in distress," *id.* at 108, *reprinted in* [1968] U.S.Code Cong. & Ad. News 2197, and the enactment itself, as quoted earlier, states that "[t]his section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress," 47 U.S.C. § 605 (1976).

As with the legislative history of the other predecessors of section 605 that have been scrutinized, reference to the committee reports and congressional debates regarding the 1934 and 1968 acts fails to give a definitive illumination of legislative purpose concerning the use of the phrase at issue here. As it turns out, and as defendant urged with respect to section 605 in its present form, the clearest indication of congressional intent is found in an analysis and comparison of the current language and punctuation of section 605 and its 1934 predecessor, which referred to those radio communications "broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress." Unlike the 1927 act, the Communications Act of 1934 contained an explicit definition of the term "broadcast" that made it evident such transmissions were those directed at the general public. 47 U.S.C. § 153(*o*) (1976); *see* p. 702 *supra.* In light of this statutory definition, the placement of the comma before and after "amateurs and others for the use of the general public" appears to denote what is seemingly parenthetical use of that phrase, emphasizing the common factor between it and the preceding term, that is, the intended public nature of the transmissions involved. The substitution of the present language in 1968 resulted in the

deletion of the first of the two commas used, but the use of the term "broadcasting" in close conjunction with the phrase in question remained unchanged, thereby supporting defendant's assertions as to its meaning.

In sum, although the legislative history of section 605 is of minimal help in clarifying the ambiguity that plagues the meaning of the phrase "amateurs or others for the use of the general public," to the extent it is useful, that history serves to bolster defendant's interpretation of its language. The confidentiality provision of the Radio Act of 1912 does appear to have applied to amateurs to prohibit them from divulging the contents of radio messages, while the addition of the exemption for amateurs in the Radio Act of 1927 is not explained adequately either in the legislative history of that act or by reference to the unenacted bills that preceded it. Perhaps the clearest indication of congressional intent is found in the language and punctuation of the Communications Act of 1934 with its definition of broadcasting and its use of that term in conjunction with the words at issue here indicating thereby that only transmissions to the general public were to be subject to disclosure. The slight punctuation change effected in the present provision in 1968 when it was substituted for the 1934 enactment fails to indicate any intent to modify the result sought to be obtained by the language of the 1934 act. As a consequence, the Court is unable to find in the legislative history of section 605 cognizable evidence that the phrase at issue has the meaning ascribed to it by plaintiff.

While it appears then that, on balance, both the language of section 605 and its legislative history support defendant's interpretation of its meaning, it should be added that another constructional tenet sometimes relied upon in judicial endeavors to discern legislative meaning adds some additional support to that result. This is the rule that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (Marshall, C. J.). As currently in force under the International Telecommunication Convention of Malaga-Torremolinos, 1973, art. 82, 28 U.S.T. 2495, T.I.A.S. 8572, the international radio regulations, which apply to amateurs, Radio Regulations, Dec. 21, 1959, art. 41, § 5(a), 12 U.S.T. 2377, T.I.A.S. No. 4893 (entered into force in the United States Oct. 23, 1961), binds the parties, including the United States, to take necessary measures to prohibit "the unauthorized interception of radio communications not intended for the general use of the public" and "the divulgence . . . or any use whatever, without authorization, of information obtained by the interception of . . . radio communications," *id.* art. 17.[5] Under defendant's interpretation of section 605, that statute would clearly place the United States in compliance with those treaty provisions and the maxim of statutory construction relating to international agreements.[6]

The Court is not unsympathetic to the desire of plaintiff James Reston, Jr., to obtain all the relevant information possible

---

5. Plaintiff's main contention with regard to this statute's conformity or nonconformity with international law is the requirement in the Radio Regulations that amateurs use "plain language" in all their transmissions, Radio Regulations, Dec. 21, 1959, art. 41, § 2(1), 12 U.S.T. 2377, T.I.A.S. No. 4893, which plaintiff sees as proof that amateur communications are not meant to be confidential. It is apparent, however, that such a requirement is designed only to prevent the amateur airwaves from being misused for the sending of commercial messages or the relaying of messages to third parties, both of which are acts prohibited under the regulations. *Id.*

6. Although the defendant, in support of its position, also sought to rely on the constructional canon that courts will give deference to the interpretation of the agency charged with a statute's administration and enforcement, *see, e. g., Ft. Pierce Util. Auth. v. United States*, 196 U.S.App.D.C. 79, 88, 606 F.2d 986, 995, *cert. denied*, 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54 (1979); *American Trucking Ass'ns v. United States*, 195 U.S.App.D.C. 266, 271, 602 F.2d 444, 449, *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979), the applicability of that rule is questionable here. In describing the parameters of that maxim, one court has stated:

to aid in his compilation of a thorough literary exposition of the extraordinary tragedy at Jonestown. It can be quite candidly said that the question of the intent of Congress in using the phrase "amateurs and others for the use of the general public" is one that can only be termed "close." For the reasons detailed herein, however, the Court finds that the defendant's motion for summary judgment should be granted.[7]

> Courts generally recognize that an administrative interpretation of a statute is entitled to some deference, but the magnitude of the deference accorded varies with the circumstances. It cannot be argued that such an interpretation is controlling; . . . [c]ourts are free to substitute their judgment for such an administrative interpretation, but they will usually accord it at least some weight in their deliberations. An administrator's views merit great weight if there is special agency expertise and lack of court expertise, reenactment of the statute in circumstances which indicate legislative approval, a longstanding interpretation, or an interpretation made at the time of the statute's enactment by administrators who were especially informed of the legislative intent ("contemporaneous construction").

*Brennan v. General Tel. Co.*, 488 F.2d 157, 160 (5th Cir. 1973) (citations omitted). Preferring to rely on the "plain language" of the statute, the Commission has never issued regulations concerning section 605, and this FOIA request has presented it with the first instance in which it has had to interpret section 605, although, as is indicated by certain exhibits attached to defendant's motion for summary judgment, since at least 1971 the General Counsel of the Commission has interpreted section 605 to allow disclosure only of those transmissions by amateurs designed for the use of the general public. As a result, of the factors mentioned above, only that relating to longstanding interpretation is even arguably involved in this instance, and that factor is, at best, minimally complied with. As such, the FCC's interpretation of this statute is entitled to little if any deference.

7. Another reason proffered by plaintiff in asserting that section 605 does not bar the disclosure here is that the transmissions in question were made in violation of Commission rules, thereby removing them from the class of communications section 605 was designed to protect. As support for this proposition, he relies upon the decision of the United States Court of Appeals for the Ninth Circuit in *United States v. Sugden*, 226 F.2d 281 (9th Cir. 1955), *aff'd per curiam*, 351 U.S. 916, 76 S.Ct. 709, 100 L.Ed. 1449 (1956). In *Sugden*, the court held that transmissions made from an unlicensed farm radio station were not entitled to the protection of section 605 and thus were subject to disclosure. The Court, however, must agree with the Commission's analysis of the distinction between *Sugden* and the instant action.

> In *Sugden, supra* [, 226 F.2d] at 285, the Court did hold that before any right of privacy attached, the voice must be legally on the air; therefore, illegal short wave transmissions were held to be outside the protective ambit of Section 605. As noted in that case, it was necessary to have a license for the transmitting set and also for any base operator to have a license. In that case, however, although the radio station was licensed, those operating it were charged with and found guilty of illegal unlicensed operation under Section 303 of the Act. In the instant case, no such charge was made. The station here was licensed and so were the amateurs charged with certain rule violations. It should be noted, however, that the May 20, 1977 Notice charged violation of Section 97.-79 of the Commission's Rules, for operating the station without a licensed amateur operator present. . . . This is not the same as the situation in *Sugden, supra*. Under the amateur rules, it is not necessary for all those who operate the station to be licensed. But it is necessary that a licensed operator be present and in control of the station as required by Rule 97.79. Thus, the fact situation here is clearly distinguishable from that in *Sugden, supra*, where it was necessary for the individuals charged to have a license in order to even use the radio station. Finally, the other violations charged in the instant case were of a more technical nature and thus render *Sugden, supra* inapplicable. Accordingly, the transmissions in the instant case do fall within the protective provisions of Section 605.

*In re Reston*, 72 F.C.C.2d 658, 668 (1979) (footnote omitted). Along this same line, the Court is unable to find that the cassette tape containing transmissions recorded by amateur operator and disclosed to the Commission as part of his protest over rules violations by the People's Temple stations is exempt from the prohibition on disclosure contained in section 605. *Cf. United States v. Axselle*, 604 F.2d 1330, 1335 (10th Cir. 1979); *United States v. Savage*, 564 F.2d 728, 732 (5th Cir. 1977); 18 U.S.C. § 2511(2)(b) (1976).

In addition, the Court does not find the fact that certain of the taped transmissions were only between the two People's Temple stations in Guyana in any way suspends the application of section 605 for that provision applies "to all interstate and foreign communication by wire or radio . . . which originates and/or is received within the United States." 47 U.S.C. § 152(a) (1976).

Not having substantially prevailed in this litigation, plaintiff's request for attorney fees and costs is denied.